**MILMARK SERVICES, INC.**

v.

**The UNITED STATES.**

No. 404–81C.

United States Claims Court.

March 23, 1983.

George W. Liebmann, Baltimore, Md., for plaintiff. Stephen L. Snyder, Pikesville, Md., of counsel.

Michael J. Denton, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

WHITE, Senior Judge.

Milmark Services, Inc. ("Milmark" or "plaintiff"), filed this action because of the termination and the alleged breach, by the Government, of Immigration and Naturalization Contract No. CO–14–80 ("the contract"), under which Milmark was providing data entry services in connection with the processing of so-called I–94 forms for the Immigration and Naturalization Service ("INS") of the Department of Justice.

The I–94 program is part of the non-immigrant document control system used to maintain information on aliens entering the United States for short-term business or vacation visits, and subsequently leaving this country. Such an alien, on entering the United States, is required to fill out a two-part form (original and carbon copy) known was INS Form No. I–94, by furnishing the information called for on the form. The carbon copy of INS Form I–94 is collected from the alien at the port of entry as an arrival record, and is sent to INS headquarters in Washington, D.C., for processing. Information from the arrival copy is then entered on magnetic tape through a data-entry terminal in a format that permits direct entry into the INS automated data base. The original of the form is retained by the alien so long as he or she remains in the United States, and is then turned in as a departure record when the alien leaves this country.

In connection with its answer, the Government filed a counterclaim for excess costs allegedly incurred in reprocuring the services which (according to the defendant) the plaintiff failed to perform under its contract.

The initial trial was held on the issues of law and fact relating to the right of the plaintiff to recover against the Government.

As explained in the opinion, the court concludes that the plaintiff is not entitled to recover.

## A. *The Alleged Procedural Errors*

A show-cause notice was served on Milmark by the INS at a meeting on May 29, 1980. The notice stated that the INS was considering a default termination of the contract because of Milmark's failure "to commence deliveries * * * within the time required by the terms" of the contract. The notice directed Milmark to present, in writing, facts bearing on the question of whether Milmark's "failure to perform arose out of causes beyond * * * [its] control and without fault or negligence on * * [its] part."

After Milmark had submitted two responses to the show-cause notice, the first on June 9 and the second on June 20, 1980, a notice of termination was issued to Milmark on July 22, 1980, by the contracting officer. The termination notice, in the form of a letter, stated that the contract was terminated "in its entirety pursuant to Clause 11, Default * * *." The notice further stated in part as follows:

Specifically the reasons for this termination are:

1. Of eleven (11) scheduled deliveries of 400,000 keyed documents each, you have delivered only 800,000 keyed records. Of this quantity it has been found through inspection that 400,000 do not conform to the contract requirements. Milmark is at present more than nine weeks behind schedule.

2. You have submitted only two of thirteen required progress reports.

3. You have failed to comply with paragraph 10 of the Special Provisions which requires that you notify the Contracting Officer of actual or potential problems which threaten timely performance of the contract.

4. You have failed on numerous occasions to return telephone calls from purchasing office staff.

The plaintiff contends that the termination of the contract was improper because of the following procedural errors:

(1) The contract was terminated for reasons not mentioned in the show-cause notice and as to which Milmark had not been allowed a period of at least 10 days after notice in which to cure the deficiencies, as required by the procurement regulations.

(2) The termination notice failed to include a determination by the contracting officer that the plaintiff's failure to perform was not excusable, as required by the procurement regulations.

It is true, as asserted by Milmark, that the show-cause notice referred only to Milmark's failure to commence deliveries within the time required by the terms of the contract, and did not refer to excessive errors committed by Milmark in performing the work, or to Milmark's failure to make progress reports, or to Milmark's failure to notify the contracting officer of actual or potential problems threatening timely performance of the contract, or to Milmark's failure to return telephone calls from the INS purchasing office staff.

With respect to Milmark's alleged failure to make timely delivery of contractual services, it was not necessary for the INS to serve a show-cause notice on Milmark in advance of termination, or to afford Milmark a 10-day (or other) period after notice in which to cure this type of alleged deficiency, or to include in the termination notice a finding that Milmark's failure to make timely delivery of contractual services was not excusable. The default provision of the contract specifically stated that if the contractor failed "to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof," the Government might "by written notice of default to the Contractor, terminate the whole or any part of this contract." From the procedural standpoint, therefore, service on Milmark of the termination notice for failure to deliver contractual services within the time specified in the contract was sufficient to terminate the contract, if Milmark was properly chargeable with default in the matter of failure to make timely delivery of contractual services.

Accordingly, if the termination of the contract was justified on the ground of

default in the timely delivery of contractual services, it is not necessary to consider the Government's failure to give Milmark advance notice of, and an opportunity to cure, the alleged deficiencies concerning excessive errors, etc.

### B. *The Alleged Failure to Make Timely Delivery*

The contract provided that Milmark was to pick up from the INS 400,000 I–94 forms between 2 p.m. and 3:30 p.m. on Friday of each week; and that each 400,000-document group would be processed and then delivered to the INS, along with a tape containing the data from the documents, between 2 p.m. and 3:30 p.m. on Friday 2 weeks after the pick-up date.

On April 24, 1980, Milmark picked up from the INS the first group of 400,000 I–94 forms for processing. Milmark picked up a second group of 400,000 documents on May 2, 1980, a third group of 400,000 documents on May 9, 1980, and a grand total of 3,600,000 additional documents after May 9, 1980, and up to July 22, 1980.

The 400,000 I–94 forms which Milmark picked up from the INS on April 24, 1980, were required by the contract to be processed and then delivered to the INS on May 9, 1980. This group, however, was not delivered to the INS until May 30, when Milmark delivered 200,000 of the documents, and June 6, when Milmark delivered the remaining 200,000 documents.

The group of 400,000 I–94 forms which Milmark picked up on May 2, 1980, were required by the contract to be processed and delivered to the INS on May 16. The earliest delivery of documents from this group occurred approximately 4 weeks after the due date of May 16, and the final delivery was made approximately 9 weeks after the due date.

The 400,000 I–94 forms which Milmark picked up from the INS on May 9, 1980, were required by the contract to be processed and delivered 2 weeks later, on May 23, 1980. None of these documents had been processed and delivered to the INS as of the time when the contract was terminated on July 22, 1980.

With respect to the total of 3,600,000 I–94 forms which Milmark picked up from the INS after May 9, 1980, only 100,000 of these documents had been processed and delivered to INS as of the time when the contract was terminated on July 22, 1980, and this batch was delivered more than 7 weeks after the expiration of the 2-week delivery period fixed in the contract.

It is clear, therefore, that Milmark did not comply with the delivery schedule prescribed in the contract, insofar as any weekly group of I–94 forms picked up by Milmark was concerned.

### C. *The Question of Excusable Failure to Deliver*

Under the contract, a default in the delivery of contractual services was excusable if the failure to perform the contract arose "out of causes beyond the control and without the fault or negligence of the Contractor."

■ Milmark contends that its failure to comply with the delivery schedule prescribed in the contract was excusable, and it mentions several factors in this respect.

### 1. *The Delay in Receiving the Award of the Contract*

Bids on the proposed contract were opened by the INS on October 24, 1979, and 20 bids were received. Milmark was, of course, one of the bidders. On or about October 26, the INS contracting officer determined, and informed Milmark, that Milmark had submitted the lowest responsive bid. However, three bid protests were received from other bidders. As these bid protests were not finally disposed of until February 28, 1980, and as it was necessary for the INS to obtain a clearance from Federal Prison Industries for the issuance, to a private concern, of a contract for automated data entry services, and it was also necessary for the INS to obtain a delegation of authority from the General Services Administration, it was not until April 22, 1980, that Milmark was finally awarded the contract by the INS.

When Milmark was informed by the INS, on or about October 26, 1979, that it had submitted the lowest responsive bid, Milmark believed that the contract would soon be awarded to it. Milmark, which had a work force of approximately 80 employees at the time, but also had a considerable amount of other work on hand, proceeded to hire about 70 new employees, of whom approximately 50 were inexperienced in key-punch work and had to be trained. After the end of the training period, Milmark retained about 50 of the 70 additional persons who had been employed in anticipation of soon receiving the contract. In addition, Milmark placed orders for a substantial amount of additional key-punch equipment that was needed for the performance of the contract.

Because the award of the contract was delayed for reasons previously mentioned, Milmark did not have enough business on hand to keep all of its employees occupied, and it was necessary for Milmark to lay off some of its employees. It was also necessary for Milmark to cancel orders that had been placed for additional equipment in anticipation of beginning work on the contract.

When the contract was ultimately awarded to Milmark on April 22, 1980, Milmark began an active campaign of attempting to recall employees who had been laid off because of the failure to receive the contract award with reasonable promptness after the bid opening. Some of the laid-off personnel declined to return to Milmark. Milmark also replaced orders for additional equipment that was needed for the performance of the contract, but substantial delay was encountered in procuring the additional equipment. In fact, it was not until about June 20, 1980, that all the necessary additional equipment was acquired. As a result of these problems, Milmark did not have, up until about June 20, 1980, the personnel and equipment needed to meet the contract schedule of processing and delivering I-94 forms.

However, when Milmark entered into the contract on April 22, 1980, it was—or reasonably should have been—aware of its personnel and equipment situation, and that it would be difficult to meet the contract schedule. Furthermore, Milmark had the option of deciding whether it would or would not undertake the task.

During the delay in making the award, Milmark extended its bid twice, once for 90 days and again for 30 days. Then the bid, as extended, expired on April 15, 1980. After that, Milmark was not under any obligation to enter into a contract, but it nevertheless willingly did so 7 days later, on April 22, 1980. Under these circumstances, it is only reasonable to conclude that Milmark voluntarily accepted the risk of being able to meet the contract delivery schedule, despite its then shortage of personnel and equipment.

Also, it should be noted that the INS did not hold Milmark to strict accountability in the matter of processing and delivering each group of 400,000 I-94 forms within the 2-week period prescribed in the contract. It has been mentioned previously that Milmark never met the contract schedule at any time between the first pick-up date of April 24, 1980, and the date when the contract was terminated, July 22, 1980. The termination letter was to have been delivered to Milmark at a meeting that was held on July 14, 1980. When this information was conveyed to Milmark at the July 14 meeting, Milmark requested another chance to demonstrate its ability to perform the contract, and promised to deliver a complete group of 400,000 I-94 forms on Friday of that week, July 18, 1980. The INS agreed to give Milmark another chance, and indicated that the termination decision would be postponed until July 18 in order to afford Milmark an opportunity to make a complete delivery of 400,000 documents. The contracting officer further indicated, however, that if Milmark failed to deliver the full set of documents on July 18, he would immediately sign and deliver a termination notice.

Milmark did not, however, deliver any processed I-94 forms to the INS during regular business hours on July 18, 1980,

although it did deliver 200,000 processed documents to the INS on Monday, July 21, 1980. It was on the following day that the contract was terminated.

There is no showing in the record that Milmark's failure to deliver 400,000 processed I–94 forms to the INS on July 18, 1980—which was the immediate reason for the termination of the contract—was caused by the delay in awarding the contract to Milmark. As previously stated, the evidence indicates that the necessary staffing and acquisition of equipment had been completed by about June 20, 1980, and the plaintiff in the meantime had gained several weeks of experience in the processing of the I–94 forms.

### 2. The Changes in the Specifications

Milmark contends, and the evidence shows, that it experienced some interference in the performance of the contract by virtue of changes which the INS made in the contract specifications after the award of the contract to Milmark.

These changes in the specifications, and some suggestions which were made by the INS to Milmark with respect to the handling of the work (and which were at least well intentioned), are detailed in the findings of fact, along with indications of the extent to which the specification changes and the suggestions by the INS affected Milmark's contract operations.

The evidence shows that the extra work which Milmark was required to perform, or which Milmark did perform, as a result of the specification changes or the suggestions made by the INS was not extensive.

Moreover, the specification changes and the suggestions were made by the INS at a conference on May 7, 1980, except for one specification change that was made on May 19, 1980. Milmark was allowed a couple of months after May 19 in which to adapt its operations to the specification changes and suggestions, before the INS terminated the contract for failure to make timely delivery of contractual services in accordance with the contract delivery schedule. There is no showing in the evidence that this was an unreasonably short period, in view of the extra work involved.

### 3. The Interpretation of I–94 Forms

Milmark asserts—and is supported on the point by evidence in the record—that a great deal of difficulty was encountered in interpreting the information on the I–94 forms which it was required to process under the contract. This difficulty was experienced from the beginning of contract performance.

In connection with the cards filled out by Hispanics, for example, it was frequently difficult for the key-punch operator to determine which of several names given by an alien on a form should be regarded as the family name. Also, the carbon copies of the cards, which Milmark had to process, were on thin paper similar to onionskin, and sometimes they stuck together. In addition, many aliens failed to fill out the cards properly, and much of the writing was illegible. Approximately 5 percent of the cards could not be key-punched at all because of defects.

The evidence in the record shows, however, that Milmark was forewarned, before it entered into the contract, that information on the cards would be difficult to interpret. The solicitation that was distributed to prospective bidders, including Milmark, in connection with this procurement indicated that "[m]ost of the documents received are hand-printed by the non-immigrant and some are difficult to read." The solicitation contained several samples of the I–94 form. In addition, it should be mentioned that one of the bid protesters was a private concern that had previously been processing I–94 forms under an earlier contract with the INS, and this bid protest emphasized the poor quality of the I–94 documents. The bid protester submitted 16 sample I–94 forms—allegedly typical of the deficiencies in the I–94 forms—to all hearing participants, including Milmark. In response, Milmark took the position that it had previously encoded and verified I–94 forms as a subcontractor for the protester

and was therefore "fully aware of the perplexity and the peculiarities i.e: handwriting, language difficulties, etc." Milmark also indicated that it was "aware of the fact that the sample forms included in the IFB are not necessarily representative of the quality required to be encoded and verified."

Moreover, during the course of the bid protest proceedings, INS and Milmark discussed the potential difficulty of performing the contract. Milmark's personnel was optimistic and indicated that the company did not perceive any problem in performing the contract or any of the required keying operations or programming.

Under the circumstances, it appears that the difficulty involved in interpreting the information on I–94 forms was not an adequate excuse for Milmark's failure to make timely delivery of required contractual services.

### 4. *The Failure to Provide Information*

■ The plaintiff contends, and the evidence shows, that the INS failed to furnish to Milmark certain information requested by the latter.

Shortly after the contract was awarded, Milmark requested that the INS furnish to it the complete program previously used for the conversion of data from the I–94 forms.[1]

The INS regarded Milmark's request as pointless and unnecessary, as the INS believed that computer instructions were needed, rather than an independent program; and the INS declined Milmark's request. Milmark desired the previous program for guidance in effecting the conversion of data from the I–94 forms; and when its request for the previous program was declined by the INS, Milmark concluded that it was necessary to subcontract the conversion aspect of the work.

Milmark encountered difficulty in obtaining a conversion program subcontractor that could successfully perform the "sign-

stripping" operation required in the conversion process. The first subcontractor retained by Milmark was unable to perform successfully the sign-stripping work required by the contract. Consequently, Milmark was forced to search for and hire another subcontractor to perform this work. The second subcontractor, which was obtained after May 2, 1980, apparently did not have any difficulty in performing the sign-stripping operation.

The evidence in the record does not establish whether the information requested by Milmark, and which the INS failed to furnish to Milmark, would or would not have been helpful to Milmark in coping with the problems involved in the conversion of data. Hence, even if it were to be assumed that the INS, as the possessor of superior knowledge, was under a legal obligation to furnish the information to its contractor on request, the record does not provide a proper basis for a holding by the court that the failure of INS to discharge its obligation in this respect was responsible for Milmark's failure to make timely delivery of contractual services.

### 5. *The Lack of INS Personnel at Milmark's Plant*

Milmark complains that the INS did not provide assistance which it needed in the form of INS personnel at its plant to assist in the problems which it encountered in the performance of the contract.

■ The evidence shows that at a conference between personnel of the INS and personnel of Milmark, which was held at Milmark's plant when INS personnel went there shortly after May 9, 1980, for the purpose of determining the reason why Milmark had failed to make delivery of the first batch of processed documents on May 9, as required by the contract, the INS offered to station a key-punch supervisor at Milmark's plant for the purpose of helping to interpret data contained on the I–94 forms. Milmark indicated at the time that

---

1. Before this contract, the INS, and then a private concern other than Milmark, had performed the data entry work in connection with the I–94 program.

the offer would be considered, but did not thereafter submit a request that INS personnel be stationed at its plant.

Although there were numerous subsequent contacts between Milmark and the INS with respect to problems which Milmark was experiencing in the performance of the contract, the attitude of Milmark consistently was to the effect that it was in the process of solving, or had solved, the problems and would soon begin a regular program of meeting the 2-week delivery schedule prescribed in the contract. Milmark did not indicate a need for the assistance of INS personnel.

There is nothing in the record from which it could reasonably be found that the INS was under an obligation to provide assistance to Milmark in the form of INS personnel.

### 6. The Test Tape

■ It is Milmark's contention that, although the contract did not contain such a requirement, the INS required Milmark to furnish a test tape for examination and review.

A preponderance of the evidence establishes—and it is found—that the INS did not require Milmark to produce a test tape and furnish it to the INS for review. Rather, at a conference which was held in May 1980, Milmark informed the INS that it had prepared a test tape and indicated that Milmark would like for the INS to review the test tape and then inform Milmark whether the company was "on the right track" with respect to programming and key-punching. The INS stated that the agency would take the test-tape and run it through the INS system, and then would provide Milmark with the results of the review. It appears, however, that the INS never furnished the desired information to Milmark.

It seems that, as a matter of courtesy and cooperation, the INS should have fulfilled its promise to Milmark with respect to the test tape. However, on the basis of the preponderance of the evidence, it cannot properly be held that the INS failed to

discharge a legal obligation to Milmark by failing to carry out its promise, and thereby excused Milmark from meeting the 2-week delivery schedule prescribed in the contract.

### 7. The Start-Up Time

■ Milmark asserts that in view of the delay in awarding the contract to it and other difficulties involved in the performance of the contract, the start-up time allowed by the contract was unreasonably short.

In this connection, it has been mentioned earlier in the opinion that, after a 2-week interval following the first pick-up of I-94 forms, the contract required Milmark to deliver to the INS 400,000 processed documents on Friday of the second week, and thereafter to deliver 400,000 processed documents on Friday of each week (each group delivered having been picked up 2 weeks earlier).

Whether the 2-week start-up time allowed by the contract was unreasonably short is academic, as the INS actually allowed Milmark a much longer period than 2 weeks after the first pick-up in which to begin the delivery schedule contemplated by the contract.

It has been mentioned in another connection that the first group of 400,000 I-94 forms which Milmark picked up on April 24, 1980, were not processed and then delivered 2 weeks later, on May 9, but, instead, were delivered on May 30 and June 6; that the delivery of the second group of 400,000 I-94 forms, which Milmark picked up on May 2, 1980, was not completed until approximately 9 weeks after the due date of May 16; that the third group of 400,000 I-94 forms, which Milmark picked up on May 9, 1980, were never delivered to the INS; and that of the total of 3,600,000 I-94 forms which Milmark picked up from the INS in weekly increments after May 9, 1980, only 100,000 were delivered to the INS and this delivery occurred more than 7 weeks after the due date.

Notwithstanding this history of delinquency, the INS gave Milmark until July

18, 1980, to begin meeting the weekly delivery schedule prescribed in the contract. In reality, therefore, Milmark was allowed a start-up period of 3 months, rather than 2 weeks.

### 8. *Summary*

To summarize the discussion in this part C of the opinion, it appears that Milmark's failure to make timely delivery of processed I–94 forms in accordance with the delivery schedule prescribed in the contract did not arise out of causes beyond the control and without the fault or negligence of Milmark. Accordingly, the INS did not err in terminating the contract under the "default" provision of the contract on the basis of such failure.

As no error was committed by the INS in terminating the contract under the "default" provision on the basis of Milmark's failure to make timely delivery of processed I–94 forms in accordance with the delivery schedule prescribed in the contract, it is not necessary to consider whether, as stated in the termination letter, Milmark was also properly chargeable with contract violations by reason of excessive errors, failure to submit progress reports, failure to notify the contracting officer of problems threatening timely performance of the contract, and failure to return telephone calls from purchasing office staff.

### D. *The Alleged Breach of Contract*

■ The alleged breach of contract by the defendant is described in the first amended complaint (denominated a petition under the rules of this court's predecessor, the former U.S. Court of Claims) in the following language:

7. The government breached the contract by rejecting in July 1980, on the basis of allegedly excessive error counts, batches submitted by plaintiff which were not beyond allowable error tolerances and by relying on alleged excessive errors in terminating the contract. Plaintiff did not learn until discovery in this action in April and May 1982 that the errors relied upon included errors in counts and in processing fields not required by the contract to be verified which, under the contract, the Government did not have the right to charge against the contractor.

The contract required Milmark to enter from eight to 10 data fields, depending on whether the document was an arrival or departure form. Of these eight to 10 data fields, the contract required that five fields be key-verified by the contractor (*i.e.*, the contractor was required to key the data a second time to ensure that the data had been accurately keyed).

Under the contract, work processed by Milmark was inspected by the INS upon the delivery of the work by Milmark. In making the inspection, the INS used 2,500 records randomly selected out of each 100,000-document batch. The INS counted errors in both verified and unverified fields. Eight batches, each containing 100,000 documents, were rejected by the INS on the ground that an excessive number of errors had been made by Milmark.

The basis for Milmark's contention that the INS breached the contract by charging Milmark with errors in unverified fields is not articulated as clearly as would be desirable. Moreover, it should be mentioned that, with respect to six of the eight batches of documents that were rejected by the INS because of excessive errors, the errors made in verified fields alone exceeded the permissible error limit.

Insofar as the other two rejected batches of documents were concerned, the following contract provision is pertinent:

* * * *It is important that all data be keyed correctly.* The Government will randomly select from each Arrival and Departure tape, two thousand and five hundred (2,500) records for inspection * * *. The two thousand-five hundred (2,500) records will be one hundred percent (100%) inspected. If after inspecting the sample quantity the Government finds that the total number of errors exceeds 2.5% of the sample lot, the entire batch will be rejected. In the event of rejection the Contractor shall be required

to redo the entire tape. * * * [Emphasis supplied.]

The only reasonable construction of the contract provision just quoted is that the contract required *all* data to be keyed correctly, and not merely those data in fields that were to be key-verified. Accordingly, it is held that the INS did not breach the contract by rejecting the batches of documents where Milmark's total errors, in both the verified and unverified fields, exceeded the permissible error limit.

## CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts, as found by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover.

IT IS THEREFORE ORDERED that the complaint shall be dismissed upon the conclusion of proceedings relative to the defendant's counterclaim.

## FINDINGS OF FACT

### The Plaintiff

1. (a) Milmark Services, Inc. ("Milmark" or "Plaintiff"), was organized by Mrs. Mildred Marcus in 1966.

(b) Before 1966, Mrs. Marcus had taken a key-punch course and had done key-punch work as a part-time job while attending Georgetown University.

(c) In 1966, the data processing industry was in a growth period and there was a lot of such work to be had. Mrs. Marcus procured a key-punch machine, made some telephone calls to prospective clients, acquired some business, and began performing the work at home. Later in that same year, Mrs. Marcus procured a second key-punch machine, and then a third machine, and hired people to operate these machines, the work still being done in Mrs. Marcus' home. Before the end of 1966, the business had grown to the point where it was necessary for Mrs. Marcus to transfer the business from her home to rented space, to acquire additional machines, and to hire additional personnel. It was at this point that Milmark was incorporated.

2. Early in Milmark's existence, the company was placed on the Federal Government's bidding list and began to obtain government contracts as the low bidder. During the 1966–79 period, approximately 95 percent of Milmark's business consisted of contracts with the Government and, during the period mentioned, Milmark performed approximately 1,000 government contracts, without being defaulted. Milmark had an excellent record in the performance of government contracts during the 1966–79 period. By 1979, Milmark's business had expanded to the point where the company was operating about 25 machines and employed approximately 80 persons.

### The INS I–94 Program

3. The Immigration and Naturalization Service ("INS") of the Department of Justice is charged with the duty of administering and enforcing the United States immigration and naturalization laws. As part of its general duties, the INS maintains a central index containing names and other pertinent information received from aliens admitted to or excluded from the United States.

4. (a) One aspect of the INS central index system is the I–94 program. The I–94 program is part of the Non-Immigrant Document Control system used to maintain information on aliens entering the United States for short-term business or vacation visits, and subsequently leaving this country.

(b) The I–94 program utilizes INS Form No. I–94, which is a two-part form (original and carbon copy) containing information received from a visiting alien on entry to or departure from the United States. The original copy of the form is retained by the immigrant so long as he or she remains in the United States, and it is turned in as a departure record when the immigrant departs the United States. The carbon copy is collected at the port of entry as an arrival record.

(c) After being completed, the carbon, or arrival, copy is sent by INS inspectors to INS headquarters in Washington, D.C., for processing. Information from the arrival copy is then entered on magnetic tape through a data-entry terminal in a format that permits direct entry into the INS automated data base.

5. Until 1976 or 1977, INS employees performed the data entry work required in the processing of I–94 forms, as part of the INS normal operations. The error rate of INS personnel in performing the work was less than 3 percent. Because of increasing INS workloads and certain terrorist activities which required a greater degree of immediate control over alien information, the INS in 1976 or 1977 began retaining private contractors to perform the entry of data from I–94 forms.

6. (a) The first contractor to handle the I–94 program was the Rehab Group, Inc. ("Rehab"), which was awarded a contract under section 8(a) of the Small Business Act as a set-aside for small businesses. Rehab held the contract for data entry work related to the I–94 program from 1976 or 1977 until early 1980, shortly before the contract involved in this case was awarded to Milmark. Rehab was allowed an error rate of 5 percent.

(b) Milmark did some work as a subcontractor under the Rehab contract. The work done by Milmark did not involve data conversions, as distinct from simple keying.

7. Generally, a private contractor performing data processing work for the INS picks up a batch of completed I–94 forms, transports the documents to its facilities, where the information is read from the documents and entered on magnetic tape, and then returns all processed documents to the INS, along with a tape containing the processed material.

### The 1979 Solicitation

8. In the summer of 1979, the INS Contracts Office began preparation of specifications for a new solicitation of the type of data entry services then being provided under the Rehab contract, which was sched-uled to expire in the fall of 1979. The preparation of the solicitation was coordinated by William L. Saffer, a member of the Contracts Office. Technical advice concerning the solicitation was provided by representatives of the technical offices of the INS, including Joseph Banscher, a senior systems analyst, and Louis Lawton, a files supervisor.

9. (a) In late August 1979, the INS personnel completed work on the I–94 solicitation. On August 29, 1979, the solicitation, No. CO–31–79, was advertised in the Commerce Business Daily.

(b) The solicitation indicated that the successful bidder would be called upon to "provide the necessary labor, equipment and other resources to encode/verify I–94 arrival/departure documents." The solicitation specified that the contractor would be required to pick up and key approximately 400,000 I–94 departure or arrival documents per week. Each 400,000-document batch was to be delivered to the INS 14 days after the documents were picked up. The solicitation also indicated that "[m]ost of the documents received are hand-printed by the non-immigrant and some are difficult to read." The prospective contractor was further cautioned that a lack of familiarity with Hispanic or other foreign names would increase the difficulty of contract performance. The solicitation also contained several samples of the I–94 forms.

(c) Concerning the quality of performance, the solicitation provided that "[i]t is important that all data be keyed correctly." However, the solicitation indicated that errors in data entry or keying which resulted from an incorrect entry of a soundex code or from illegible handwriting would not be counted by the INS in the inspection of completed work. The solicitation provided that the INS would inspect all completed work by checking 2,500 records in each 100,-000-document batch. The solicitation stated that the contractor would be required to produce work having errors in no more than 2.5 percent of the documents produced.

However, the contractor was to have the option of returning to the INS all documents it deemed to be illegible or incomplete, without penalty to the contractor. The record does not establish that the error rate was unreasonable under industry standards.

(d) The proposed contract attached to the solicitation contained among the general provisions a "Default" clause, which provided in part as follows:

(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

\* \* \* \* \* \*

(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor.
\* \* \*

10. (a) The bid opening date, as amended, was set for October 24, 1979.

(b) On October 24, 1979, the INS conducted a bid opening in connection with the solicitation, and 20 bids were received. Milmark was one of the bidders. Approximately 24 to 48 hours after the bid opening, the INS contracting officer determined that Milmark had submitted the lowest responsive bid on the solicitation.

### The Pre-Award Survey

11. (a) On October 30, 1979, an INS pre-award survey team, consisting of the contracting officer's representative and certain members of the technical staff, traveled to Milmark's facilities to conduct a pre-award survey. At the time of the pre-award survey, INS was aware that a bid protest had been filed by one of the bidders, Fifth Generation Systems, Inc., concerning the solicitation. A determination was made by INS to conduct the pre-award survey notwithstanding the one pending protest.

(b) The members of the pre-award survey team reviewed Milmark's facilities, labor situation, financial resources, and other matters bearing on contract performance.

(c) Concerning its labor situation, Milmark indicated to the team that it planned to perform the contract without using subcontractors. Further, although Milmark indicated that it would need to add new employees in order to cover all of its ongoing projects, Milmark indicated that it had sufficient personnel already employed to start performance of the contract.

(d) The INS pre-award survey team also discussed with Milmark certain aspects of contract performance. The INS personnel pointed out the error provision in the solicitation and inquired about Milmark's ability to meet the error rate of not to exceed 2.5 percent, in view of the possible difficulty in interpreting I–94 documents. Milmark indicated that it would have no problem in keeping the error rate down to 2.5 percent, even with the difficulty involved in keying I–94 documents.

12. (a) At the conclusion of the pre-award survey, the pre-award survey team recommended award of the contract to Milmark. The pre-award survey team found Milmark's employees to be "comfortable," "satisfied," and "apparently experienced." The team further noted that Milmark appeared to possess an adequate quality control program, utilizing a senior programmer to oversee all work and a central control desk to log in all incoming and outgoing

work. The survey team concluded that Milmark "can perform the job required, from the standpoint of operational capability."

(b) Based on the recommendations of the pre-award survey team, the contracting officer later determined that Milmark was a responsible contractor, qualified for the contract award.

### Bid Protest Proceedings

13. Subsequent to the bid opening, three bid protests were made concerning the solicitation. The protesting bidders were: Fifth Generation Systems, Inc., which filed a protest with the contracting officer 3 days after the bid opening; Rehab, the incumbent contractor, which filed a protest with the contracting officer approximately 8 to 10 days after the bid opening; and Consumer Computer Corp., which filed a protest more than 10 days after the bid opening.

14. On December 13, 1979, the GAO denied the protest of the Consumer Computer Corp. because it was "untimely."

15. (a) The GAO held hearings regarding Rehab's protest.

(b) As the successful bidder, Milmark participated in the protest hearings and received all correspondence sent or received by the INS Contracts Office.

(c) Rehab protested the potential award of the contract to Milmark, arguing that the deficient quality of the I–94 documents would prevent any bidder except the incumbent contractor from meeting the error rate required by the solicitation. In support of this argument, Rehab submitted 16 sample I–94 documents—allegedly typical of the deficiencies in I–94 forms—to all hearing participants, including Milmark. In response to Rehab's allegations, Milmark informed the GAO that it had previously encoded and verified I–94 documents as a subcontractor for Rehab and was therefore "fully aware of the perplexity and peculiarities i.e.: handwriting, language difficulties, etc." Milmark also indicated that it was "aware of the fact that the sample forms included in the IFB are not necessarily representative of the quality required to be encoded and verified."

16. (a) During the bid protest proceedings, the INS contracting officer's representative communicated with Milmark personnel on a regular basis, to inform them of their rights in the bid protest proceedings and to discuss generally the progress of the proceedings. INS and Milmark personnel also discussed the potential difficulty in performing the contract. Milmark personnel was optimistic, indicating that the company perceived no problem in performing the contract, or any of the required keying operations or programming.

(b) During this period, Milmark extended its bid twice, once for 90 days to March 15, 1980, and once for 30 days to April 15, 1980.

(c) The INS and Milmark personnel also discussed the time period that might be necessary to resolve the bid protest. The INS contracting officer's representative indicated the possible length of the GAO proceedings, based on published GAO protest procedures, but did not make any representation concerning a specific date for the contract award.

17. In late January, 1980, the INS contracting group decided to proceed with the contract award notwithstanding the pendency of Rehab's bid protest, because the group believed that the INS would prevail in the bid protest. On February 6, 1980, the contracting officer issued a determination of responsibility for Milmark concerning the solicitation and possible contract award. On February 7, 1980, the contracting officer requested permission to proceed with the award prior to resolution of the bid protest. However, higher authority in the Department of Justice denied the contracting officer's request for authority to award the contract, and directed INS to refrain from awarding the contract until the bid protest was resolved. In early February 1980, Milmark's vice president was told that the contract would not be awarded until the bid protest was resolved.

18. On February 12, 1980, the INS was notified that Rehab had withdrawn its protest to the solicitation, and that the GAO was terminating the protest proceedings as to Rehab.

19. On February 28, 1980, the GAO denied the protest of Fifth Generation Systems, Inc., holding that the INS had properly rejected the bid of that company on the ground of non-responsiveness.

### The Contract Award

20. (a) After the INS was notified on March 3, 1980, that the last bid protest had been resolved, the INS Contracts Office began preparation for the contract award.

(b) Certain administrative procedures were required prior to the award of the contract. First, the INS was required to obtain a delegation of procurement authority from the General Services Administration ("GSA") to procure automated data processing services independently of the GSA. Second, the INS was required to clear its procurement of data entry services with the Federal Prison Industries, which performs data entry services for the Federal Government on a continuing basis.

(c) The GSA eventually issued a delegation of procurement authority to INS for the contract.

(d) Federal Prison Industries granted a clearance to INS, subject to the right of Federal Prison Industries to process 100,000 records a week from the accumulated backlog of I–94 documents.

21. Because of the delay in the contract award, the time period of the contract was shortened and the number of documents to be processed was reduced.

22. After the required administrative work was completed, Milmark was informed on April 18 or 21, 1980, that the contract would be awarded to that company.

23. Notwithstanding the expiration of Milmark's bid (as extended twice, for 90 days and 30 days, respectively) on April 15, 1980, Milmark and the INS executed contract No. CO–14–80 ("the contract") on April 22, 1980, for the processing of an estimated 9,200,000 I–94 forms, at a unit price of 3.1256¢ per document, during 1980, for a total contract price of $287,500.

### Milmark's Preparations for Contract Performance

24. (a) When Milmark was informed by the INS, on or about October 25 or 26, 1979, that it had submitted the lowest responsive bid under the 1979 solicitation, Milmark believed that the contract would soon be awarded to it. Milmark proceeded to hire about 70 new employees, of whom approximately 50 were inexperienced in key-punch work and had to be trained; and Milmark also placed orders for additional key-punch equipment.

(b) The training period for inexperienced new personnel was approximately 2 or 3 weeks. After that period ended, some of the new employees were weeded out, but Milmark retained about 50 of the 70 additional persons who had been employed in anticipation of receiving the contract award.

(c) It was Milmark's plan to operate two shifts each workday in order to handle the contract and the other business that Milmark had on hand.

25. Because the award of the contract was delayed for the various reasons mentioned in previous findings, Milmark did not have enough business on hand to keep all of its employees occupied. Although strenuous efforts were made by Milmark to obtain additional business from non-governmental sources, and Milmark achieved some success in this effort, the business was not sufficient to keep the company's entire personnel occupied, and it was necessary for Milmark to lay off some of its employees. It was also necessary for Milmark to cancel orders that had been placed for additional equipment in anticipation of beginning work on the contract.

26. (a) When the contract was ultimately awarded to Milmark on April 22, 1980, Milmark began an active campaign of recalling employees who had been laid off because of the failure to receive the contract award with reasonable promptness after the bid opening. Some of the laid-off personnel declined to return to Milmark.

(b) Milmark also replaced orders for additional equipment that was needed for the performance of the contract.

27. As a result of the unusual delay in receiving the contract award, Milmark sustained a substantial amount of expense that the company would not have experienced in the absence of such delay.

### Performance of the Contract

28. (a) On April 24, 1980, Milmark picked up from the INS the first four 100,-000-document batches for processing.

(b) Under the contract, these documents were to be processed and then delivered to the INS on May 9, 1980, which was 2 weeks from the date on which the records were picked up at the INS.

29. (a) Milmark picked up a second group of 400,000 documents from the INS on May 2, 1980.

(b) The contract required that Milmark process these documents and deliver them to the INS within 2 weeks.

30. (a) On May 7, 1980, the INS technical staff asked Milmark to make certain corrections in the program described in the specifications.

(b) One such change concerned the location (order of display) of two data fields (classes of information) labeled Status 1 and Status 2 in the output master file (output display). This problem was raised during a discussion between Milmark's programmer and the INS technical representative. The specifications called for the listing of information in a certain order in the master file record (display). During the May 7 conversation, the INS technical representative indicated that the specification should be corrected to provide for the output (display) of the information originally called for under Status 1 in the location for Status 2, and vice versa. This correction required only the switching of information locations, and the contractor was not required to re-key or re-enter work previously processed. The only work required to correct the program involved changing the program that sets the output order of the data and then re-running the data to adapt to the new order.

(c) The INS technical representative also identified another needed change in the specifications during the May 7, 1980, conversation with Milmark's programmer. In addition to the reversed order of the Status 1 and Status 2 outputs in the master file record (display), the specifications also failed to provide any direction to enter information for the character field originally shown as Status 1 and ultimately changed to Status 2 in the master file record (display). The output for the character field ultimately listed as Status 1 was a space or number character used to hold computer space open for later use by the INS. This character was produced by computer insertion of the same space character for all entries and required no entry of information by the key-punch operator. However, the Status 2 output required the entry of one of four different characters by the key-puncher to provide for an output in the master file record in one of four possible values, L, B, D, or a space character. The special indications L, D, or B related to special cases of immigrant status, representing less than 5 percent of the documents submitted to the contractor for processing. Moreover, the 5 percent special case category documents were segregated from ordinary documents at the time they were sent to Milmark. In order to remedy this problem, Milmark was required only to re-enter and process the 5 percent of the I–94 forms falling into this special segregated group of documents.

31. In addition to asking that Milmark make the specification changes referred to in finding 30, the INS technical representative, at the meeting on May 7, 1980, suggested that Milmark perform an edit (not required by the contract) to ensure that an individual's date of entry into the United States was shown to be equal to or earlier than the then-current date. The INS technical representative did not direct that the edit be added, but did suggest the edit as a measure which Milmark might use in attempting to ensure greater accuracy in its work. The addition of the suggested edit

would not require the re-keying of documents already processed. The time required for correction would be from 10 to 15 minutes to incorporate the edit check in the computer program, plus 1 to 2 hours to re-process the information entered from each batch of documents through the edit.

32. Still another problem was raised during the May 7, 1980, conversation between the INS technical representative and Milmark's programmer. This concerned difficulty which Milmark was having in implementing an edit that was required by the contract in order to ensure that the date of entry into the United States listed for an individual was later than the individual's date of birth. Because the computer output of the specifications required only the entry of the last two digits of a given year, the computer was unable to differentiate between dates occurring in the year 1880, for example, and dates occurring in the year 1980. The INS technical representative instructed Milmark's programmer just to make a judgment on whether to assume that an individual who entered the United States in 1980 and whose year of birth appeared on the I–94 form as "80" was 100 years old or less than a year old.

33. (a) On May 7, 1980, the INS technical representative was informed that Milmark was producing a master file record output for the state of destination in a two-letter alphabetic state code. Upon being so informed, the technical representative indicated to Milmark's programmer that Milmark's program should produce in a binary language output, as indicated by the contract. The contract required the input of state of destination data in a two-entry alphabetic code, but with the output appearing as a single-entry binary character after being converted from the two-character alphabetic code entry.

(b) The failure to follow the contract specifications on this point resulted from confusion on the part of Milmark's programmer in interpreting an exhibit to the contract, which, through inadvertence, was not included in the contract but was later furnished to the contractor. Although the contract indicated that the output of the program was to be binary, Milmark's programmer interpreted the added table, which listed both the alphabetic character input and the binary output, as calling for an alphabetic output.

34. (a) Milmark failed to make delivery on May 9, 1980, of any of the documents which Milmark had picked up on April 24, 1980 (see finding 28) and which were required by the contract to be delivered to the INS on May 9.

(b) Milmark picked up four more groups of 100,000 documents each from INS on May 9, 1980.

35. (a) The INS contracting officer's representative and members of the INS technical staff traveled to Milmark's plant to determine the reason for the failure to make delivery. Milmark indicated that they had been delayed in performing the contract by certain changes in the specifications directed or requested by the INS technical staff (see findings 30–32). In response, the INS technical staff took the position that the changes were minor and should not have caused a serious disruption to the contractor's schedule.

(b) At the conference referred to in paragraph (a) of this finding, or at about that time, Milmark informed the INS that it had prepared a test tape and indicated that Milmark would like for the INS to review the test tape and then inform Milmark whether the company was "on the right track" with respect to programming and key-punching. The INS stated that the agency would take the test tape and run it through the INS system, and then provide Milmark with the results of the review. It appears, however, that the INS never furnished the desired information to Milmark.

(c) Also at the conference mentioned in paragraph (a) of this finding, or at about that time, the INS offered to station a key-punch supervisor at Milmark's plant for the purpose of helping to interpret data contained on the I–94 documents. Milmark indicated that the offer would be considered, but did not thereafter submit a request that INS personnel be stationed at its plant.

(d) From the beginning of Milmark's performance of the contract, it had difficulty in interpreting information on I–94 cards. In connection with cards filled out by Hispanics, for example, it was frequently difficult for the key-punch operator to determine which of the several names given by an alien represented the family name. Also, the carbon copies of the cards, which Milmark had to process, were on thin paper similar to onionskin, and sometimes they stuck together. In addition, many aliens failed to fill out the cards properly, and much of the writing was illegible. Approximately 5 percent of the cards could not be key-punched at all because of defects. The INS did not charge Milmark with errors when it key-punched the third names of Hispanics (even though this may not have been correct in some instances), or when Milmark returned, without processing, cards that could not be key-punched because of defects.

36. A final change in the INS specifications was directed in a conversation between the INS technical representative and the Milmark programmer on May 19, 1980. During this conversation, the INS technical representative indicated that the specifications incorrectly indicated that the departure batch letter should be entered as an alphabetic entry, whereas the contract should have listed the entry as being binary. The departure batch letter was a single letter that was used to identify separate groups of 5,000,000 documents and hence only changed after every group of 5,000,000 documents. Thus, the only correction needed in the program was a one-step change requiring 10 to 15 minutes. Once this computer program step had been taken, the only remaining work required was the reprocessing of the records to insert this different batch letter, a step requiring one or two hours.

37. Documents which Milmark received from the INS on April 24, 1980 (see finding 28) were delivered to the INS on May 30, 1980, when Milmark delivered two of the 100,000-document batches, and on June 6, 1980, when Milmark delivered the remaining two 100,000-document batches. Milmark was from 3 to 4 weeks late in these deliveries under the contract delivery schedule.

38. The second group of 400,000 documents which Milmark picked up in the first week of May (see finding 29) were not delivered until late June and July, 4 to 9 weeks after the 2-week delivery date prescribed in the contract.

39. None of the four groups of 100,000 documents each which were received from the INS on May 9, 1980 (see finding 34(b)) was ever returned to the INS.

40. Subsequent to May 9, 1980, and up to July 22, 1980, Milmark picked up 36 groups of 100,000 I–94 documents from INS. Milmark succeeded in processing only one of these groups, and was more than 7 weeks beyond the 2-week delivery schedule in delivering this group of documents.

41. (a) At the time when Milmark prepared its bid, it planned to perform the contract without the use of subcontractors. However, when Milmark's programmer first received the specifications, shortly after the contract award, he identified certain aspects of the programming specifications which he believed could not be performed on Milmark's computer. Milmark requested that the INS furnish to it the complete program previously used for the conversion of data from the I–94 cards. The INS regarded this as pointless and unnecessary, as the INS believed that computer instructions were needed, rather than an independent program, and the INS declined Milmark's request. The evidence in the record does not establish whether the requested information would or would not have been helpful to Milmark in coping with the problems involved in the conversion of data.

(b) Milmark encountered difficulty in obtaining a conversion program subcontractor that could successfully perform the "sign-stripping" operation required in the INS program specifications. The phrase "sign-stripping" indicated the removal of a positive or negative sign from a computer entry, thereby saving storage space in the computer. This operation is used where

plus or minus signs are unnecessary because all numbers used are of a positive value, such as in the instant case where the inputs represented dates. The first subcontractor retained by Milmark to assist in the programming operations was unable to perform successfully the sign-stripping work required by the contract. As a result of this subcontractor's inability to perform the required sign-stripping, Milmark was forced to search for and hire another subcontractor to perform the programming conversion work. The second subcontractor was obtained after May 2, 1980. There is no evidence that Milmark's second subcontractor had any difficulty in performing the sign-stripping operation.

42. Milmark's performance under the contract was significantly inhibited by the inability of its programmer and its first subcontractor to understand the various computer operations required under the contract. Ralph Simonetta, Milmark's programmer, obtained his training exclusively through on-the-job training or extension school courses while he served with the Air Force. Although Milmark had previously performed work for the INS on several occasions, Mr. Simonetta had not performed the programming work on the prior contracts. Mr. Simonetta admitted at trial that certain aspects of the programming work involved in this contract were "out of my realm of expertise."

43. The total time required to remedy the programming difficulties was approximately 2 weeks.

44. Milmark's records indicate that the computer programming difficulties were resolved by early June 1980, more than 1½ months before the termination of the contract.

45. Milmark also experienced problems in ordering sufficient data processing equipment to perform the contract. Although Milmark needed an additional 22 key stations to perform the contract, the equipment was not on order when the contract with the INS was signed. Milmark did not begin making arrangements to purchase the equipment until after the contract was

signed and, in fact, did not sign a contract for the purchase of the needed equipment until May 29, 1980, more than a month after entering into the contract. Furthermore, Milmark did not receive this equipment until after June 20, 1980, more than 2 months after entering into the contract.

46. Although the contract required weekly progress reports from Milmark, Milmark submitted only two weekly progress reports in the 12 weeks it held the contract.

47. The contract also required the contractor to give timely notice to the INS of any delays in the performance of work under the contract. Notwithstanding this requirement, Milmark never gave timely notice of any problems threatening the performance of work under the contract. In addition, Milmark failed to return telephone calls from the INS.

### Inspection Procedures

48. (a) The contract required Milmark to enter from eight to 10 data fields, depending on whether the document was an arrival or departure form. Of these eight to 10 data fields, five fields had to be key-verified. Key-verification of a data field means that the contractor keys the data a second time to insure that they have been accurately keyed. Under the contract, work processed by Milmark was inspected by the INS upon delivery of the work by Milmark. The inspections were performed at the INS, using a random sample of 2,500 records from each 100,000-document batch. The random-sampled documents were printed out on a line-by-line basis and were compared entry-by-entry with the original document. After the inspection was completed, the INS notified Milmark of the inspection results by telephone. In the event that a batch was rejected because of excessive errors, Milmark was sent a copy of the random sample print-out and the I-94 documents shown thereon, together with Milmark's tape and the complete set of I-94 documents.

(b) In making the inspection, the INS counted errors in both verified and unverified fields.

49. Concerning the inspection of data processed by Milmark, the contract provided as follows:

* * * It is important that all data be keyed correctly. The Government will randomly select from each arrival and departure tape, two thousand and five hundred (2,500) records for inspection, a figure which equals two and one half percent (2.5%) of each batch. The two thousand-five hundred (2,500) records will be one hundred percent (100%) inspected. If after inspecting the sample quantity the Government finds that the total number of errors exceeds 2.5% of the sample lot, the entire batch will be rejected. In the event of rejection the Contractor shall be required to redo the entire tape. This will include, but is not necessarily limited to correction of INS identified errors, searching for and correcting all other errors, and if appropriate re-keying the entire batch. The corrected tape when resubmitted will then be reinspected in accordance with the foregoing procedures. Errors resulting from incorrectly coded Soundex codes or illegible handwriting will not be counted. Legibility/illegibility of documents will be the decision of the Government and will be final. Mr. L. Lawton will be the Contracting Officer's representative for discussion of and decisions on errors, and unless it can be shown that his decision was arbitrary, it will be final. The Government may take up to sixty (60) calendar days to complete inspection and acceptance of a completed tape.

50. Paragraph 5 of the General Provisions of the contract, dealing with the subject of "Inspection," provided in part as follows:

(b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. * * *

51. A number of the 100,000-document batches submitted by Milmark during the course of the contract were rejected by the INS because of excessive errors found during the inspection process. Available records indicate that a total of eight batches of 100,000 documents each were so rejected. Even if the INS counted only errors in key-verified fields in determining the error count, six of eight batches still contained sufficient errors in key-verified fields to warrant rejection under the contractual error standard.

52. (a) Milmark was required to submit a batch control sheet with each batch of processed documents, showing the documents keyed, the number of illegible documents, and any missing documents. In this regard, the contract provided as follows:

10. BATCH CONTROL SHEETS: Accompanying each batch of records on tape returned to INS will be a batch control sheet providing the following information:

   a. Batch Number
   b. First Document Number
   c. Last Document Number
   d. Number of Records on Tape
   e. Total Incomplete or Illegible Documents Returned
   f. Total Unused Numbers (Gaps in the numbering sequence)
   g. Total Unnumbered Documents

The number of records on tape, the number of illegible or incomplete documents returned and the total unused numbers should equal 100,000 for each batch. The Contractor is required to balance these figures. With the Batch Control Sheet will be a list of all returned documents and missing numbers in the document number sequence.

(b) Under this contractual language, the INS rejected certain batches submitted by Milmark where the batches did not contain a properly balanced batch control sheet. Correction of a batch control sheet problem could be accomplished immediately, because all that was required was the completion of a new batch control sheet, accurately reflecting the documents processed.

*Termination Proceedings*

53. As of May 29, 1980, Milmark had made five pick-ups of 400,000 documents each, but had failed to process and return any of the documents. Milmark's failure to return any of these 2,000,000 documents led to the issuance of a show-cause notice by the INS contracting staff on May 29, 1980. The show-cause notice was presented to Milmark at a meeting attended by representatives from both Milmark and the INS. The show-cause notice stated that the Government was considering a default termination of the contract because of Milmark's failure "to commence deliveries * * * within the time required by the terms" of the contract. The notice directed Milmark to present, in writing, facts bearing on the question of whether Milmark's "failure to perform arose out of causes beyond * * * [its] control and without fault or negligence on * * * [its] part."

54. (a) Milmark submitted two responses to the show-cause notice issued on May 29, 1980.

(b) On June 9, 1980—which was after Milmark delivered the first batch of 400,000 processed documents to the INS on May 30 and June 6—Milmark filed a response indicating that its failure to perform had been caused by "delays resulting from the protest lodged against [the solicitation] * * * and other administrative delays in awarding the * * * contract." The response of June 9, 1980, also stated in part as follows:

The nature of the work involved is complex and under normal circumstances requires a 3–4 week learning curve, that, coupled with the various program and instruction clarifications further delayed our delivery schedule.

As outlined in our meeting with INS on May 29, 1980, we have taken positive steps to rectify this situation by ordering 42—Model 3742 Keystations which will provide an additional 88 keytape operators solely dedicated to this contract. We, therefore, feel that even though we are at present time not meeting our delivery schedule—we will be able to within a very short period of time. Although the circumstances prevented us from meeting our scheduled deliveries on time, it is our full intent and commitment to perform this contract as specified.

(c) On June 20, 1980, Milmark submitted a supplemental response to the show-cause notice of May 29, 1980. In this supplemental response, Milmark again asserted that delayed deliveries under the contract were primarily due to the delay in awarding the contract to Milmark. The effects which the delay in receiving the contract had on Milmark's operations were explained in the following language:

* * * Personnel and equipment had to be added to our facility in order to gear up for this contract in order to handle the magnitude of the work flow requirements. Time and money was expended. We were then informed of the protest and all efforts to provide for this contract were halted. We were further informed that it should be settled by December 1, 1979. Since this matter had not been settled by January 30, 1980 and due to the uncertainty of the contract, other work had to be placed into production in order to fill the allocated man and machine hours. To do otherwise would not have been sound business judgment on our part. Even at the last minute, we were informed that the entire contract may have to be awarded to the Federal Prisons. When the contract was finally awarded on April 22, 1980, we again had to gear up equipment and manhours. At the time we bid the contract we had ample unused productive hours available and it would have come at a low period of production, allowing us to efficiently overcome the required learning curve. With the installation of 22 IBM 3742's (44 keystations) being completed on June 20th, 1980 totally dedicated to this contract, we feel that we now have the required personnel and equipment in place and have completed our learning curve and are now able to deliver the required 400M documents per week.

55. The INS contracting officer found that Milmark's responses to the show-cause

notice were inadequate because they failed to propose a plan for correcting the deficiencies, which the contracting officer concluded were attributable to organizational problems within Milmark.

56. The INS contracting staff concluded that the contract should be terminated for default and began to prepare a termination letter. The letter of termination was prepared by the contracting officer's representative, and was reviewed by the contracting officer. In making the decision to terminate the contract, the contracting officer considered various excuses presented by Milmark and concluded that the excuses did not excuse Milmark's failure to perform under the contract. The contracting officer also determined that the services provided by Milmark could be obtained from another source, that it was not likely that Milmark could become current in its delivery schedule, that the INS had sufficient funds to finance reprocurement, and that Milmark had no other contracts with INS at that time which might be impeded by termination.

57. The termination letter was to have been delivered to Milmark in a meeting scheduled for July 14, 1980. At the July. 14 meeting, the contracting officer indicated his intent to terminate the contract for default. In response, the Milmark representatives requested another chance to demonstrate their ability to perform the contract, and promised delivery of a complete 400,000-document batch on that Friday, July 18, 1980. The contracting officer agreed to Milmark's request, and indicated that the termination decision would be postponed until July 18 to allow Milmark an opportunity to make a complete delivery of 400,000 documents. The contracting officer further indicated that if Milmark failed to deliver the full set of documents on the required date, he would immediately sign and issue the termination notice.

58. Milmark failed to deliver 400,000 documents during normal business hours on July 18, 1980. The contract provided that deliveries and pick-ups should be made between 2:00 p.m. and 3:30 p.m. on Fridays.

At approximately 3:30 in the afternoon of Friday, July 18, Milmark's vice president called the INS contracting officer's representative to indicate that Milmark had problems with its conversion subcontractor and would be unable to deliver the documents until after the close of business at the INS at 4:30 p.m. The INS contracting officer's representative indicated that delivery after 4:30 was unacceptable. Milmark's vice president indicated that Milmark would attempt to make delivery of all 400,000 documents by 7:00 a.m. on Monday, July 21, 1980.

59. Milmark made delivery of some processed I–94 documents on Monday, July 21, 1980, but Milmark failed to deliver a full 400,000-document batch. Only 200,000 documents were delivered.

60. By means of a letter addressed to the plaintiff and dated July 22, 1980, the contracting officer terminated the contract "in its entirety pursuant to Clause No. 11, Default * * *." The letter further stated in part as follows:

Specifically the reasons for this termination are:

1. Of eleven (11) scheduled deliveries of 400,000 keyed documents each, you have delivered only 800,000 keyed records. Of this quantity it has been found through inspection that 400,000 do not conform to the contract requirements. Milmark is at present more than nine weeks behind schedule.

2. You have submitted only two of thirteen required progress reports.

3. You have failed to comply with paragraph 10 of the Special Provisions which requires that you notify the Contracting Officer of actual or potential problems which threaten timely performance of the contract.

4. You have failed on numerous occasions to return telephone calls from purchasing office staff.

A Show Cause Notice was issued to Milmark on May 29, 1980, with a ten (10) day response time. Your response was received on June 9, 1980, but was so vague as to the cause of your problems, and was

absent any explanation as to how Milmark proposed to overcome the delinquency. Furthermore, the Contractor has not cured the delinquency as required by paragraph (a)(ii) of Default clause. It is my additional duty to advise you that the terminated supplies or services may be procured against your account, and that Milmark will be held liable for any excess costs rising out of such reprocurement. The Government also reserves all rights and remedies provided by law or this contract.

The Contractor is herewith advised that this decision of the Contracting Officer may be appealed in accordance with the Disputes clause of the contract.