*857
 
 NIES, Circuit Judge.
 

 This ease is an appeal from the judgment of the United States Claims Court (White, Senior Judge)
 
 [1]
 
 holding that the Immigration and Naturalization Service (INS) is not liable for termination of a contract with Milmark Services, Inc., following Milmark’s non-performance.
 

 The suit was brought directly to the United States Court of Claims from the contracting officer’s decision in accordance with 41 U.S.C. § 609(a)(1) (Supp. II 1978). Under § 403(d) of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25, 58 (1982), the case was subsequently transferred from the U.S. Court of Claims Trial Division to the U.S. Claims Court. Pursuant to Claims Court Rule 54(b), the Claims Court, having rendered a decision that Milmark was not entitled to recover and having determined that there was no just reason for delay in the entry of judgment on Milmark’s claims, entered judgment for the Government. Since a final judgment has been entered on Mil-mark’s claims, we have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).
 

 Milmark’s position is that its default under the contract was caused by factors beyond its control and without its fault or negligence. The Claims Court held that Milmark’s failure to perform according to the terms of the contract was not excusable. Milmark challenges certain findings of fact made by the trial court, the absence of findings allegedly necessary to the decision, the exclusion of proffered testimony, and the asserted failure by the court to recognize the Government’s duty of cooperation.
 

 Having considered Milmark’s arguments, the record, and the decision of the Claims Court, we affirm.
 

 The Standard of Review
 

 The standard of review by this court of factual determinations by the U.S. Claims Court is not specifically delineated by statute. No decision of this court has directly addressed this issue. However, in
 
 CACI, Inc.-Federal v. United States,
 
 719 F.2d 1567, 1582 (Fed.Cir.1983), the court concluded with the statement, “the kind of inquiry and analysis the Claims Court made in this case ... was
 
 clearly erroneous
 
 ____” (Emphasis added.)
 

 The Government in its brief makes no argument directed to this issue but assumes by repeated references to findings being supported by “substantial evidence” that the more stringent “substantial evidence” standard rather than the “clearly erroneous” standard applies.
 
 See SSIH Equipment, S.A. v. USITC,
 
 718 F.2d 365, 379, 218 USPQ 678, 690 (Fed.Cir.1983). Milmark merely asserts that certain findings are clearly erroneous, being contrary to the weight of the evidence.
 

 While this court has not adopted the rule of some circuits that a party must specifically set out the applicable standard of review as an initial paragraph in its brief, an appellate court must always consider its standard of review and it is helpful to the court for the matter to be set out specifically in the briefs so that it can be determined whether the parties are or are not in agreement on the function of this court.
 

 With respect to findings of fact by the U.S. Claims Court in a
 
 de novo
 
 proceeding on a contract claim, we believe that the appropriate standard of review is “clearly erroneous” as in appeals from trials in district courts.
 
 Heisig v. United States,
 
 719 F.2d 1153, 1157-58 (Fed.Cir.1983). As defined by the Supreme Court in
 
 United States v. United States Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948):
 

 A finding is “clearly erroneous” when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
 

 Accordingly, the clearly erroneous standard will be applied with respect to review of factual disputes in this case.
 

 
 *858
 

 Background
 

 The INS maintains information on aliens entering and leaving the United States by requiring aliens to complete an 1-94 form upon passage through immigration. After being completed, the form is sent to INS headquarters for processing. Information on the form is entered onto magnetic tape and fed into the INS data base.
 

 In August of 1979, the INS solicited bids for the performance of data entry services in connection with the 1-94 program. The solicitation indicated that the successful bidder would be required to enter 400,000 documents per week, that each batch of 400.000 processed documents would be due at the INS within two weeks after pick-up, that some documents would be “difficult to read,” and that the error rate on every 100.000 documents could not exceed 2.5%.
 
 [2]
 
 Milmark submitted the lowest bid and was awarded the contract. The bid solicitation was protested, delaying the contract award and upsetting Milmark’s preparation. A protest submitted by the incumbent contractor raised the question of whether Mil-mark could perform within the error rate, given the poor quality of the 1-94 forms. Milmark gave assurances during the protest that, as a subcontractor for the incumbent contractor, it was “fully aware of the perplexity and peculiarities, i.e., handwriting, language difficulties, etc.” Milmark perceived no problem in performance and twice extended its bid. The contract was executed on April 22, 1980.
 

 Milmark picked up the first batch of 400,-000 documents on April 24, but failed to deliver the entered data by the May 9 due date. On May 30, Milmark delivered 200,-000 of the processed documents, and on June 6, delivery was made of the remaining 200,000. The second batch of 400,000 documents was also delivered well after the due date specified in the contract. Milmark subsequently picked up 10 batches of 400,-000 documents on schedule, but had succeeded in processing only 100,000 of these documents by July 18, 1980. During the period of April to July 1980, Milmark submitted only two of 12 progress reports required under the contract.
 

 On May 27, 1980, the INS issued a show cause notice advising Milmark that a default termination of the contract was being considered. As a result of the subsequent delinquencies in Milmark’s performance, the INS decided to terminate the contract on July 14. At Milmark’s request, termination was postponed and Milmark was given a final opportunity to demonstrate its ability to handle the contract by delivering a full batch of 400,000 documents on Friday, July 18. Upon Milmark’s failure to deliver any of the processed documents until Monday, July 21, the INS contracting officer terminated the contract by letter dated July 22, 1980. Milmark then filed suit against the Government for damages for breach of contract on July 24, 1981.
 

 The Claims Court held that: (1) Milmark had not complied with the delivery schedule prescribed in the contract; (2) the INS was not required to give Milmark advance notice of, and an opportunity to cure, deficiencies in performance; (3) the INS had not breached the contract by rejecting all of Milmark’s work because of excessive errors in the submitted tapes; and (4) Mil-mark’s failure to deliver was not excusable on any ground asserted, i.e., delay in receiving the award of the contract; changes in the contract specifications by the INS; difficulty in interpreting the 1-94 forms; refusal by the INS to furnish certain requested information; failure of the INS to provide personnel assistance at Milmark’s plant; failure by the INS to evaluate and return a test tape submitted by Milmark; or the short length of the start-up time.
 

 I
 

 The section of Milmark’s brief entitled “Statement of Facts” presents an indiscriminate intermingling of undisputed facts with extrapolations and conclusions of counsel and statements of witnesses
 
 *859
 
 which had been rejected by the trial judge as lacking in credibility. At the conclusion of this confusing introduction to the ease, a single finding of the trial judge with respect to the number of documents delivered on July 21, 1980, is asserted to be clearly erroneous. Neither in the “Statement of Issues” nor in the “Argument” section are other findings of the trial judge specifically attacked. Only when one reaches appellant’s “Conclusion” is it apparent that appellant’s position would require reversal of a number of factual determinations, and that, indeed, appellant seeks to have this court reexamine the record in its entirety and reevaluate factually each of the excuses for its default, requesting here, in effect, a trial
 
 de novo
 
 on the record. This is not the role or function of an appellate court. We will, therefore, address only the specific findings of fact challenged by appellant and the legal arguments we are able to discern from its brief.
 
 [3]
 

 II
 

 Milmark contends that the Claims Court erred in failing to recognize the INS’s duty of cooperation. According to Milmark, the opinion of the Claims Court “proceeds as though there is no duty.”
 

 Milmark asserts that the specifications of the contract were misleading and created “a problem of practical production impossibility,” that the contract provided an inadequate lead time, that the INS improperly refused to disclose computer programming information requested by Milmark, and that the INS failed to provide “customary technical assistance” to Milmark during the course of the contract. Each of these actions, according to Milmark, constituted a breach of the INS’s implied duty of cooperation.
 

 Milmark further complains that the opinion of the Claims Court discusses none of the case law cited to it relating to the Government’s duty of cooperation. Mil-mark points, for example, to
 
 Helene Curtis Industries, Inc. v. United States,
 
 160 Ct.Cl. 437, 312 F.2d 774 (1963), for the proposition “that where the government possesses special knowledge not shared by the contractor which is vital to the performance of the contract, government has an affirmative duty to disclose such knowledge.”
 

 As the above statement recognizes, however, and the
 
 Helene Curtis
 
 opinion clearly indicates, the Government’s duty must be considered in light of the circumstances:
 

 There are many contracts ... where a contractor can reasonably be expected to seek the facts for himself — in which the Government may be under no duty to volunteer information in its files____ [T]here are other instances in which the defendant is clearly under an affirmative obligation and cannot remain silent ....
 
 [T]he circumstances here
 
 give rise to a duty to share information. [Emphasis added; citations and footnotes omitted.]
 

 312 F.2d at 778.
 

 In the instant case, Judge White did not hold that there was no duty of cooperation. Rather, he carefully examined all the evidence presented and was unpersuaded, in view of the circumstances of the case, that INS had breached such duty. Moreover, Judge White noted that Milmark had failed to demonstrate that the alleged breaches by INS were a cause of the default.
 

 The Claims Court opinion contains a comprehensive discussion of the arguments presented by Milmark and reflects a thorough understanding of the issues involved. We see no clearly erroneous factual finding or legal error in the court’s conclusion that Milmark’s default could not be excused on the basis of any failure by the INS to fulfill its duty of cooperation.
 

 Ill
 

 Milmark also argues that the Claims Court erred in not excusing delay in deliv
 
 *860
 
 ery of tapes because of the failure of the INS to evaluate test tapes submitted by Milmark and to advise Milmark of the results. Milmark points to an INS memorandum from a file supervisor at the INS indicating that he had been given a test tape from Milmark, would have an inspection conducted, and would notify Milmark of the results so that “they may begin converting the keyed records to master file format.” Milmark asserts (and the record confirms) that it never received a response from INS as to the acceptability of the test tape.
 

 The Claims Court reviewed the evidence presented on this issue, but, finding the submission of the test tape to have been voluntary, held that the INS was under no contractual obligation to review the tape. The court concluded:
 

 It seems that, as a matter of courtesy and cooperation, the INS should have fulfilled its promise to Milmark with respect to the test tape. However, on the basis of the preponderance of the evidence, it cannot properly be held that the INS failed to discharge a legal obligation to Milmark by failing to carry out its promise, and thereby excused Milmark from meeting the 2-week delivery schedule prescribed in the contract.
 

 We discern no legal error in the conclusion of the Claims Court that the INS had no obligation to evaluate the tape. In any event, Milmark could not have relied on the INS memorandum, as asserted. The document was an intragovernmental memo and was not sent to Milmark. There is no evidence in the record that the INS instructed Milmark to withhold delivery until after approval of the test tape.
 

 IV
 

 Milmark also argues that the Claims Court improperly excluded portions of testimony proffered by Milmark’s witnesses regarding the INS’s course of dealing with respect to prior, concurrent, and subsequent contractors. Milmark refers specifically to the testimony of Mr. Ruger, who became president of Milmark after termination of the contract in dispute, and Mr. Remson, a Government contracting officer for the INS prior to the instant contract.
 

 The Claims Court admitted the portion of Mr. Ruger’s testimony relating to interpretation of the specifications, but excluded his testimony regarding his experiences in connection with other Government contracts. The Claims Court reasoned that the latter testimony “does not relate to the sort of scientific and technical and specialized knowledge that would be helpful in connection with determining some issue of fact in the case.”
 

 As to Mr. Remson, it appears that the Claims Court excluded some testimony as hearsay and may have excluded other portions proffered as expert testimony. Even with respect to the portions of Mr. Remson’s testimony which were accepted, such as his opinion on whether the 1-94 program was worthwhile, the court commented that the testimony lacked probative value.
 

 Since the admissibility of expert testimony is within the discretion of the trial judge, this action is to be sustained unless manifestly erroneous.
 
 Salem v. United States Lines Co.,
 
 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). We are unpersuaded by our review of the trial transcript that a manifest error has been shown in the conduct of the trial.
 

 V
 

 Milmark next asserts that the Claims Court’s specific findings relating to deliveries made on July 21 are clearly erroneous. There is no dispute that the due date for performance was July 18, and that the INS did not consent to an extension of the due date, nor acquiesce in late delivery. As stated previously, the July 18 date itself was a last-chance extension (at Milmark’s request) of proposed termination on July 14.
 

 Since Milmark has not demonstrated that delivery after July 18 was approved by the INS, neither the fact of delivery nor the number of documents delivered on July 21
 
 *861
 
 is relevant to performance under the contract. Nor does the refusal by the INS to consider a revised delivery schedule after that date indicate that termination was “pretextual and designed to make Milmark a scapegoat,” as Milmark contends.
 

 VI
 

 Finally, Milmark asserts that even if termination was proper, Milmark is entitled to payment for 400,000 out of the 800.000 processed documents it actually delivered. The Claims Court found that all 800.000 processed documents were rejected by the INS for excessive errors. Milmark asserts that this finding is clearly erroneous, and that 400,000 processed documents were not rejected. In support of its position, Milmark points to the termination letter which reads, in pertinent part:
 

 1. Of eleven (11) scheduled deliveries of 400,000 keyed documents each, you have delivered only 800,000 keyed records. Of this quantity it has been found through inspection that 400,000 do not conform to the contract requirements.
 

 According to Milmark, this letter constitutes an admission by the INS that 400,000 processed documents were within the permissible error rate.
 

 In rebuttal, counsel for the Government explained that the INS had not completed inspection of the work processed by Mil-mark until after the termination letter had been sent. The record supports the Government’s position and indicates that the remaining 400,000 processed documents were, in fact, ultimately rejected upon inspection. Thus, the Claims Court’s finding that all 800,000 were rejected is fully supported by the record.
 

 VII
 

 For the above reasons, the judgment of the Claims Court is
 
 affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Reported at 2 Cl.Ct. 116 (1983).
 

 [2]
 

 . We note that the specified error rate did not penalize the contractor for errors if illegible 1-94 forms were returned to the INS without processing.
 

 [3]
 

 . When fact-findings are set out in numbered paragraphs, as was meticulously done in this case, counsel may easily designate challenged fact-findings by number. The court expects such designation to be made.