**MASSMAN CONSTRUCTION CO.,**
**Plaintiff-Appellant,**

v.

**TENNESSEE VALLEY AUTHORITY,**
**Defendant-Appellee.**

**No. 84–5375.**

United States Court of Appeals,
Sixth Circuit.

Argued April 17, 1985.

Decided Aug. 13, 1985.

R.W. Miller, argued, Miller & Bash, P.C., Stephen J. Dennis, Kansas City, Mo., for plaintiff-appellant.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Associate Gen. Counsel, Edwin W. Small, (argued), Tennessee Valley Authority, Knoxville, Tenn., for defendant-appellee.

Before MERRITT, CONTIE and WELLFORD, Circuit Judges.

WELLFORD, Circuit Judge.

On March 13, 1975, Tennessee Valley Authority (TVA) awarded Massman Construction Co. (Massman) a contract for excavation of a discharge channel and construction of sheet pile cells at TVA's Raccoon Mountain Pumped Storage Project on the Tennessee River near Chattanooga, Tennessee. The contract initially called for the completion of all work by December 15, 1975, and contained a standard "Disputes" clause setting out the manner for handling contract disputes in accordance with TVA's usual administrative procedures. The contract price was $2,565,400.00.

Because of project delays, TVA advised Massman not to begin the project until August, 1976. TVA later directed Massman to shut down its dredging and soil operation between April 30 and August 1, 1977 due to environmental concerns and a fish spawning at the location for most of the river excavation and dumping. Massman finally completed all required work under the contract in February of 1978.

Massman subsequently submitted claims for additional costs allegedly caused by these delays in the amount of $1,168,984.00. An exchange of letters ensued between the parties over these substantial claims. A TVA purchasing agent rejected Massman's cost calculations in a letter dated June 4, 1979. On June 20, 1979 Massman appealed to TVA's Director of Purchasing and the Director appointed a representative (James W. McCarter) to consider Massman's claims. On November 20, 1979 the Director's representative decided that TVA was liable for excess costs pertaining to the three-month suspension of excavation. Yet the Director's representative also decided that TVA was not liable for those costs pertaining to the delayed commencement of the work. Massman presented its monetary claims of cost for the suspension of excavation, and the Director's representative ruled that TVA owed Massman a total of $361,336 for the suspended period of 1977.[1]

Claiming additional amounts for the 1977 suspension period and substantial amounts for delay at the onset of the job, Massman filed a timely appeal with TVA's General Manager pursuant to the contract's disputes provision. The General Manager appointed Dean Kenneth L. Penegar, of the University of Tennessee College of Law, as his representative to conduct an evidentiary hearing on Massman's claims. In response to Massman's inquiries about hearing procedures, TVA stated by letter on January 18, 1980 that the "only published regulations relating to hearings in TVA contract disputes are those implementing the Contract Disputes Act of 1978."[2] According to the TVA letter, the instant controversy was "not governed by that act [the Contract Disputes Act]" but was to be determined solely under the Disputes clause of the contract.

The parties agreed to separate hearings on the liability and damages aspects of Massman's claims. On August 4, 1980, Dean Penegar opened hearings on liability, wherein TVA contested liability for both the start-up delay and the later suspension of excavation. After presenting evidence, both parties submitted numerous post-hearing briefs. In March of 1981 Dean Penegar issued a decision holding that TVA was liable for costs due to the start-up delay as well as the later work suspension. Dean Penegar scheduled a later damages hearing for which the parties again submitted multiple post-hearing briefs. Almost a year later in 1982, Dean Penegar issued his decision rejecting Massman's damage computations.

---

1. TVA paid Massman the $361,336 award and some additional extras on the job claimed by Massman, a total of $420,667.00.

2. 41 U.S.C. §§ 601–613.

Dean Penegar had asked the parties to submit computations in accordance with his decision on issues of liability of TVA. Massman proposed an order for an award of $809,472 in addition to the $420,667 already paid. TVA submitted its computation for a total award of $378,541, which required that Massman return the difference of approximately $42,000 between the $420,067 already paid out and its proposed award.[3]

Dean Penegar entered a final order on May 27, 1983 essentially accepting TVA's proposed liability calculations and rejecting Massman's calculations. Shortly before the hearing officer's order, Massman filed suit in federal district court against TVA for damages, claiming a lack of procedural fairness in the administrative process, legal errors on the part of hearing officer, and demanding a *de novo* hearing.[4]

The district court subsequently granted TVA's motion for summary judgment. The court rejected Massman's contention that it was entitled to *de novo* hearing of all issues under the Contract Disputes Act of 1978, and instead held that Massman had waived any right to proceed under the Act. The district judge also upheld the administrative decision as neither arbitrary, capricious, nor lacking in substantial fairness. Finally, the court held that an *ex parte* communication by TVA with Dean Penegar, under the circumstances, was no basis to void the decision.

Massman now challenges the district court's grant of summary judgment affirming Dean Penegar's administrative decision. Massman asserts that TVA failed to provide the minimum information necessary for Massman to make a knowing waiver of its right to demand a *de novo* hearing under the Act. Second, regardless of its alleged right to a *de novo* hearing under the Act, Massman asserts that the administrative decision fails to deserve judicial def-

erence due to numerous legal errors as well as an arbitrary and capricious treatment of evidence in the record. Finally, Massman asserts that the court should not have granted summary judgment because material issues of fact exist concerning its procedural fairness claim.

**I. Does the Contract Disputes Act apply?**

The trial court reached the following negative conclusion with respect to this question:

Plaintiff's rights to proceed under the Contract Disputes Act are regulated by the provisions of 18 C.F.R. § 1308.4 (1983). This section requires that in all claims involving pre-Act contract disputes initiated after March 1, 1979, a written notice of election to proceed under the Act must be included in the document first requesting a decision by the contracting officer. Plaintiff failed to include such a notice of election in its letter of June 20, 1979, wherein plaintiff first submitted its claim to TVA. Thereby plaintiff waived its rights to proceed against TVA under the Act and is bound by the administrative appellate remedies provided in the Contracts Disputes clause [of the contract]. *See Brown & Root Development, Inc. v. TVA,* 681 F.2d 1313 (11th Cir.1982).

The trial court failed to discuss Massman's assertion that it did not *knowingly* waive its rights. By inference, however, the court held that Massman was bound by the relevant statutes and regulations regardless of any lack of actual knowledge.

We express reservations about the district court's position that Massman waived its statutory remedy by failing to follow the procedure required under 18 C.F.R. § 1308.4. We agree with the district court that 18 C.F.R. § 1308.4 requires all pre-Act contractors who initiate a dispute *after* March 1, 1979, to provide immediate notice

---

**3.** This amount was slightly more than the damages amount calculated by the Director of Purchasing's representative, but the hearing officer considered the case *de novo.*

**4.** Upon learning of Massman's suit, a TVA attorney contacted the hearing officer to inquire when his decision would be forthcoming. Massman objects to this *ex parte* communication.

of their election to proceed under the Act.[5] There is some question, however, whether Massman had actually initiated the dispute *before* March 1, 1979. It is clear, for example, that before this date Massman had exchanged more than a dozen memos with TVA regarding their claimed cost charges.

On appeal TVA argues that not until after March 1, 1979 date did the varying cost estimates exchanged by TVA and Massman materialize into a "dispute" under the Act. TVA emphasizes that Massman never literally referred to the disagreements with TVA as a "dispute" until June 20, 1979. This first use of the word "dispute" came in Massman's request to the TVA Director of Purchasing to reconsider the purchasing agent's rejection of its final cost estimates.[6]

TVA also argues that no dispute was pending with a *contracting officer* before March 1, 1979. TVA points out that 18 C.F.R. § 1308.4(a) refers to "any dispute pending *before a contracting officer* on March 1, 1979...." The TVA contract with Massman specifically stated that the TVA purchasing agent administering the contract was not "the Contracting officer" for purposes of the disputes clause of the contract.[7] Massman's pre-March 1, 1979

exchanges with purchasing agent Baltz did not therefore technically constitute a controversy before a "contracting officer." The contract instead specified the *Director of Purchasing* as the contracting officer,[8] and Massman did not bring the issue before the Director until the June 20, 1979 letter in which the word "dispute" was used for the first time.[9]

We could thus base a decision on the referenced regulatory language and definitions concerning the lack of any dispute pending on March 1, 1979. TVA, however, published its regulations under the Contract Disputes Act on May 22, 1979—only two weeks before its purchasing agent rejected most of Massman's cost charges and less than a month before Massman responded by initiating a "dispute" with the Director of Purchasing. Before the belated issuance of TVA's regulations, the language of the Act itself certainly seemed to give contractors in the posture of Massman an open opportunity to proceed under its provisions. The official note on the "Effective Date" of the Act stated that the legislation

shall apply to contracts entered into one hundred twenty days after the date of enactment [November 1, 1978]. Notwithstanding any provision in a contract

---

5. 18 C.F.R. § 1308.4 states in pertinent part: (a) A Contractor whose contract is excluded from this part under § 1308.3(b) may elect to proceed ... with respect to any dispute pending before a Contracting Officer on March 1, 1979, or initiated thereafter.... (b) A Contractor makes an election under paragraph (a) of this section by giving written notice to the Contracting Officer stating that the Contractor elects to proceed with the dispute under the Act. For disputes pending on March 1, 1979, the notice shall be actually received by the Contracting Officer within 30 days after the Contractor receives the Contracting Officer's decision. For disputes initiated thereafter, the notice shall be included in the document first requesting a decision by the Contracting Officer.

6. The Massman letter stated in pertinent part: The undersigned, Massman Construction Co., is your general contractor for the above-referenced project. *A dispute has arisen,* which Mr. George H. Baltz, Supervisor, Construction Equipment and General, Mechanical Section, ruled on by a letter dated June 4, 1979.... (Emphasis added).

7. In its general conditions, the contract stated: *Contracting Officer.* The Contracting Officer shall be the Director of Purchasing, TVA, or his duly authorized representative. *Except for decisions on disputes under the provision entitled DISPUTES,* the Director of Purchasing has designated the Purchasing Agent who administers this contract for TVA as his duly authorized representative to act as the Contracting Officer for all purposes in the administration of this contract.... (Emphasis added).

8. *See id.* In the absence of any specification in the contract, 18 C.F.R. § 1308.2(e) states that a purchasing agent possesses the status of "contracting officer." Yet 18 C.F.R. § 1308.2(j) states that the meaning specified for a term in a contract will take precedence over the usual regulatory definition.

9. The Director of Purchasing then passed the issue to his representative, Mr. McCarter.

made before the effective date of this Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer *or initiated thereafter.*

Pub.Law 95–563 § 16, 92 Stat. 2383 (Nov. 1, 1978), 41 U.S.C.A. § 601 (West 1985 Supp.) (Note on "Effective Date") (emphasis added).

We also note the quite different and more equitable treatment of pre-Act contractors with disputes pending before March 1, 1979, under the same TVA regulations. Under 18 C.F.R. § 1308.12(b)(3) TVA is required to include "information about a contractor's right of appeal" under the Act to all such contractors in the final decision of the contracting officer. TVA gave only a somewhat ambiguous reference to the Contract Disputes Act on January 18, 1980 after Massman had inquired about what TVA regulations governed the hearing procedure before Dean Penegar. Without further explanation, TVA's General Manager stated that such regulations (i.e., 18 C.F.R. § 1308 *et seq.*) applied only to disputes under the Contract Disputes Act and that this dispute was not under the Act.

Another circuit has affirmed the constitutionality of these regulations against a similar contractor complaint about lack of notice and general procedural unfairness. *See Brown & Root Development, Inc. v. TVA,* 681 F.2d 1313 (11th Cir.1982). Yet in *Brown & Root,* the contractor had more than two and a half months to discover and master the intricacies of the new TVA regulations concerning election under the Act. Here the contractor had less than thirty days to ascertain its rights. Under the circumstances, we have difficulty holding that Massman made a knowing waiver of its right under the Act. Such a holding would seem contrary to the view stated in *S.E.R. Jobs for Progress v. United States,* 759 F.2d 1, 3 (Fed.Cir.1985), and *National Electric Coil v. U.S.,* 227 Ct.Cl. 595, 597 (1981), that the contractor must make a "knowing election" before waiving its rights under the Act.

■ We rather state as grounds for our decision that Massman has waited too long for institution of action *under the plain language of the Act itself.* The TVA representative issued a final decision on November 20, 1979, more than a year after the Contract Disputes Act became law. And regardless of the import of TVA regulations issued pursuant to the Act, the contractor should have been put on notice by the language of the Act that *any action* seeking judicial review under the Act itself *shall be filed* within a year from its receipt of the contracting officer's decision. The Act clearly states:

(2) In the case of an action against the Tennessee Valley Authority, the contractor may only bring an action directly on the claim in a United States district court pursuant to section 1337 of Title 28, notwithstanding any contract provision, regulation, or rule of law to the contrary.

(3) Any action under paragraph (1) or (2) *shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer* concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court.

41 U.S.C. § 609(a)(2) and (3) (emphasis added). Massman's complaint was not filed until March 17, 1983, some forty months after its receipt of the contracting officer's decision. It is thus evident that Massman has failed to comply with the statutory requirement. Massman argues that TVA's refusal to provide adequate notice about the procedural regulations issued pursuant to the Act excuses its failure to seek timely judicial review under the statute. We are not persuaded; TVA's actions had no effect that could hide the plain language of the statute which precludes Massman's demand for a *de novo* hearing under the Act.

It seems clear in this record that Massman knowingly chose to present its claims pursuant to the contract's Dispute clause. The hearing officer then considered the evidence independently from the contracting officer's prior decision. We find that Massman 1) had a full and fair opportunity

to present its case administratively, 2) knew or should be charged with knowledge of the Contract Dispute Act's time limitations, and 3) at least was apprised of the existence of promulgated regulations. Thus Massman's failure to claim the applicability of the Act in a timely fashion legally forecloses that claim. Massman has also failed to persuade us of any equitable entitlement to "another bite of the apple" by *de novo* review under the circumstances of this record, especially in view of the Act's purpose of facilitating "speedy and efficient resolution" of public contract disputes.

## II. Should the decision of the hearing officer be affirmed?

█ The contract disputes clause states that the hearing officer's decision is "final and conclusive ... except on questions of law" or unless determined to be "fraudulent or capricious or arbitrary" or "grossly erroneous" or "not supported by substantial evidence." This variegated but definitely limited contractual standard of review has been approved by the courts. *See Crass v. T.V.A.*, 460 *F.Supp.* 941 (E.D. Tenn.1978), *aff'd*, 627 F.2d 1089 (6th Cir. 1980). This limited review is mandated also by 41 U.S.C. §§ 321–322. *See Crown Coat Front Co. v. United States*, 386 U.S. 503, 513, 87 S.Ct. 1177, 1183, 18 L.Ed.2d 256 (1967) (discussion upon review of a similar disputes clause.) The burden, of course, is upon Massman to establish that

the administrative findings are "grossly erroneous" or unsupported by "substantial evidence." *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241, 1251 (1970) (using substantial evidence standard); *Milmark Services, Inc. v. United States*, 731 F.2d 855, 857 (Fed.Cir.1984) (opting for clearly erroneous standard).

Dean Penegar's March 3, 1981 decision after a full evidentiary hearing concluded that (1) the delay in starting work "was TVA's responsibility—so far as the contractor's escalation in costs because of that delay is concerned," and (2) "interruption of dredging and spoiling for three months in 1977 was also chargeable to TVA...." Thus, the hearing officer originally decided the two liability issues submitted to him substantially in favor of Massman.[10]

█ Dean Penegar, however, did not adopt Massman's contentions about the extent of TVA's liability. Massman claimed a fourteen month delay at the outset (from June 15, 1975 to August 18, 1976).[11] The hearing officer decided that TVA was chargeable with a ten month delay (October 15, 1975 to August 18, 1976) at the outset, finding that Massman knew upon visiting the construction site before making its bid that the work "could not begin before October 1, 1975." He noted further that the "expected" beginning date of June 15, 1975 was specifically "not guaranteed."[12] Thus, despite the fact that "time

**10.** TVA does not contest, on appeal, the hearing officer's determination of October 1, 1975, as a "start date for purposes of computing damages," although it took the position at the administrative appeal that it should not be liable for any delay in starting the project.

**11.** Massman also claimed that it was expecting a full-scale equitable adjustment in the contract price due to the TVA's purchasing agent's promise concerning the delays in a letter dated October 28, 1975. Massman argued that it would not have gone through with the job without such a promise of a major equitable adjustment. The hearing officer found that the TVA agent possessed *apparent although no actual* authority to promise a full-scale equitable adjustment rather than mere breach of contract relief. As discussed *infra* at 1124–1125, the hearing officer found no actual authority because the contract

did not call for full-scale equitable price adjustments due to delay. He also ultimately rejected the argument of equitable estoppel against TVA due to Massman's failure to prove that it detrimentally relied on the agent's unjustified promise and would not have performed the contract otherwise. This determination by the hearing officer is not clearly erroneous.

**12.** The contract specifically stated that the June 15, 1975 starting date was "expected and not guaranteed." In an April 23, 1975 letter, Mr. John Massman, president of the appellant construction firm, also acknowledged to TVA's purchasing agent that at an earlier meeting "we were informed that because of scheduling problems and delays TVA is having, our initial start-up on the contract will be delayed until after January 1, 1976." He further acknowledged that earlier when looking at the project before

was of the essence" and that a 215 day job length time was specified, Dean Penegar found that TVA's delay until October 1975, was not a basis for liability.

The findings of the hearing officer regarding this issue are not demonstrably erroneous. We also affirm the legal conclusion that there was unreasonable delay on TVA's part for no more than approximately ten months. *See Parish v. United States*, 120 Ct.Cl. 100, 98 F.Supp. 347, 348 (1951), *cert. denied*, 342 U.S. 953, 72 S.Ct. 625, 96 L.Ed. 708 (1952) (distinguishing between delay caused by government's "want of diligence" and delay "resulting from the exercise by the government of some right reserved to itself [in contract]").

██ Massman also seems to contends that the decision must be deemed arbitrary and capricious simply because the hearing officer ultimately awarded Massman less damages than did the representative of the TVA contracting officer. We cannot agree with this argument. The Disputes clause in the contract stated that the hearing officer's decision was to be "upon the basis of the evidence presented at the hearing" before him. He was not necessarily bound by the evidence presented to or the findings made previously by the TVA representative. We will thus consider only the specific damages findings about which Massman complains.

## A. Equipment expense (apart from the 1977 three month suspension).

Massman makes this major complaint: Massman incurred $726,212.00 worth of equipment expenses, which was mainly equipment rented from third parties, for the 274 days of delay beyond the 3 month shutdown. Although the hearing officer found 184 days of delay for which Massman was entitled to an equitable adjustment for such items as direct and indirect labor, the hearing officer failed and refused to grant Massman even one dollar for this equipment rental for 1 day, let alone the 274 claimed days of delay or the 184 days of compensable delay acknowledged by the hearing officer. The failure to so compensate Massman for equipment costs incurred during this period of delay is a clear error of law subject to *de novo* review.

First, in addressing this issue, we disagree that the alleged "failure to compensate" for added equipment rental expenses was an "error of law," and we have already decided that Massman is not entitled to *de novo* review. Massman must show that hearing officer Penegar's decision in this respect was either "grossly erroneous" or was not based on "substantial evidence." Dean Penegar found Massman's "days-of-total-delay approach generally unacceptable" because there were other contributing factors to Massman's claimed increased costs besides TVA's actions in postponing the start-up of the project and suspending the ongoing operations. He concluded that Massman must establish TVA's breach in causing start-up delay as "a substantial factor in causing the injury" in form of claimed damages generally and as to extra equipment expenses. He further concluded in this respect:

There has been no clear and specific showing of loss arising out of the original delay by TVA. The owned equipment of Massman was released to other Massman jobs early enough apparently to obviate any idling loss it may have incurred during this period of time. And with respect to the claim for rental payments, Massman's own witness has shown that there was an equivalent gain to Massman in the use of its cheaper equipment on the other jobs—presum-

the Massman bid was accepted, a TVA agent "had informed our personnel that it may be October 1st before any work could commence...." Massman added in this April 23 letter that we "feel that the bidding documents indicated that the work would proceed *sometime during 1975* and that our bid had to be

based on some time frame.... [emphasis added]." In August 1975 TVA responded to Massman in a letter that the "estimated date for beginning work" was "about April 1, 1976." In October 1975, TVA amended this start-up estimate to a starting date not before August 15, 1976.

ably during any and all of the times in question in this dispute.

As indicated by Dean Penegar, Massman's damages theory emphasized the difference in its expected costs for use of owned equipment and actual rental costs after the delay. In support of its contention for "outside equipment rent," Massman submitted a worksheet indicating "actual rental costs" of $882,629.50 for eight items, including $415,292.50 for a Lima Crane Barge, and the balance for other barges and scows allegedly utilized for varying monthly periods. Offset from this total was a figure for "expected owned equipment," including four items only, three barges and one scow (three of them for a maximum of ten months) of $198,215. Added to the total claim in this regard was an insurance expense for certain equipment of $47,800. A net "extra cost" figure of nearly $317,000 was claimed to have been expended on the Lime Crane Barge rented for about 12 months, whereas Massman's ten month expected "owned rate" for comparable equipment was set out to be less than one-fourth of that total.[13]

Massman's president testified that if the firm had been able to start the job in October of 1976, it would have "anticipated having to rent *some*" of the listed rental equipment (emphasis added). He also testified, however, that "we expected to utilized [sic] some certain items of equipment for less time than we did utilize it." In testifying specifically about the Lima Crane Barge, Massman said it was "utilized as a result of our not having owned equipment

available to utilize on the project." The Lima equipment was described as "the big machine that was used to perform all the excavation work."[14] The "monthly owned rate" applied by Massman to equipment allegedly comparable to the rented Lima Crane Barge was $9,860 a month (in contrast to the $30,000 a month rental allegedly paid). This expected rate for owned equipment "basically ... represents equipment depreciation ... inter company entries that we establish in an overall pool. ..." Massman's president testified that appellant had 15 or 20 cranes at the time with life expectancy of from four to eight years, and that the rates paid for the rented Crane Barge and the Drill Barge were "certainly high rates," and that the rented equipment, like Massman's owned equipment, was not new.[15]

Dean Penegar concluded that Massman had proven an insufficient causal connection between its claim for substantial extra costs regarding initial delay in respect to major equipment. Like the TVA contracting officer representative, however, Dean Penegar allowed Massman an extra amount for "the difference between the monthly rental of the four pieces of equipment in question .... for three months on the one hand and the projected owner charges for the equivalent equipment for those three months ..." We find substantial evidence to support this latter finding with respect to the 1977 summer interruption.

On the other hand, we must examine the record carefully in respect to the hearing

---

13. Massman's president testified that if work started on October 1, 1975, he would have expected to have completed the project in 287 days due to added construction requirements during the job. TVA amended this original schedule of 215 days by allowing 52 days extra. Massman testified that his firm actually took 306 days to perform, including "the extra assigned work by TVA."

14. With respect to an "EHB Barge," however, for which Massman sought to claim $11,788 as a damage claim item, its president testified that this was "owned" not rented equipment. This testimony seems inconsistent with the listed claim for extra barge rental costs.

15. It should also be noted that in Massman's written claim submitted to TVA's purchasing agent Baltz on October 31, 1978, the total amount set out for "equipment escalation" was approximately $498,762 for "additional rental." This, to be sure, did not include all "additional third party equipment on the job," or the mobilization charge of $25,000, but did include the major category of additional equipment items, such as the Lima Crane Barge, the Drill Barge, and other "Rig Barges." The cost of insurance claimed "for the time rented" was $37,805 instead of $47,800. Massman does not attempt to explain these discrepancies in its claims at different times.

officer's disallowance of *any* claimed damage for the ten month beginning delay by TVA. The existence of some substantial damages seems inevitable during a ten-month delay regardless of the inadequacies of proof. Our analysis, nevertheless, must be guided by the indisputable legal principle that the burden to prove such actual damages lies squarely on the plaintiff. As the Court of Claims (now Federal Circuit) stated in *Wunderlich Contracting Company v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968–69 (1965):

> A claimant need not prove his damages with absolute certainty or mathematical exactitude. *Dale Construction Co. v. United States*, No. 134–57, Ct.Cl., December 11, 1964; *Houston Ready-Cut House Co. v. United States*, 96 F.Supp. 629, 119 Ct.Cl. 120 (1951). It is sufficient if he furnishes the court with a reasonable basis for computation, even though the result is only approximate. *F.H. McGraw & Co. v. United States, supra* [130 F.Supp. 394, 131 Ct.Cl. 501 (1955) ]; *Locke v. United States*, 283 F.2d 521, 151 Ct.Cl. 262 (1960). Yet this leniency as to the actual mechanics of computation does not relieve the contractor of his essential burden of establishing the fundamental facts of liability, causation, and resultant injury. *River Construction Corp. v. United States* [159 Ct.Cl. 254 (1962) ], *supra; Addison Miller, Inc. v. United States*, 70 F.Supp. 893, 108 Ct.Cl. 513 (1947), *cert. denied*, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (1947); *J.D. Hedin Construction Co., Inc. v. United States, supra*, 347 F.2d [235] at pp. 246–47 [171 Ct.Cl. 70] [1965].

In *Wunderlich* the plaintiff contractor experienced numerous unforeseen delays at least partly attributable to the government. The contract consequently took 318 days longer than expected to complete. The *Wunderlich* court thus directly addressed the question whether a substantial damage amount can simply be *presumed* from this kind of long delay. The *Wunderlich* court rejected the appropriateness of any such presumption by stating:

> It was plaintiffs' obligation in the case at bar to prove with reasonable certainty the extent of unreasonable delay which resulted from defendant's actions *and to provide a basis for making a reasonably correct approximation of the damages which arose therefrom.* [Citations omitted.] Broad generalities and inferences to the effect that defendant *must* have caused some delay and damage because the contract took 318 days longer to complete than anticipated are not sufficient. [Citation omitted.]. *Id.* 351 F.2d at 969. [First emphasis added; second emphasis in original].

Stripped of any presumption favoring the existence of damage, Massman's presentation of proof is, unfortunately, inadequate. Massman's damage calculations are essentially based on net differences between the lower cost originally expected for using its owned equipment versus the higher cost actually incurred to rent equipment in light of the delay and consequential release of its owned equipment. As Dean Penegar's decision rightly suggests, however, this kind of calculation fails to provide a realistic estimate because it assumes that Massman's owned equipment was idle during the delay. In fact, however, Massman's president testified that his company transferred its owned equipment to other jobs soon after being informed of the delay in October 1975.

We can plausibly imagine that Massman experienced, at least, substantial added costs by reason of the unexpected 10 month delay at the outset for maintaining, transporting and transferring equipment, and lay-up expenses. On the other hand, Massman may have experienced significantly lower equipment costs on these other jobs due to its unexpected use of owned rather than rented equipment. Massman had the clear burden to present these cost and expenses estimations and prove a reasonable basis for its damage calculations. *Wunderlich, supra.*

There is some relevant evidence in this record supporting Dean Penegar's ultimate finding of failure to prove a significant loss

on Massman's part. Its president testified that the cost spread between rented and owned equipment on the other jobs represented "a similar difference in rates" to the spread between rented and owned equipment at the TVA job. Thus it is uncertain that Massman must surely have experienced a substantial loss and the extent of such loss. In the absence of any clear and persuasive cost explanations, we decide that Dean Penegar was not clearly or grossly wrong in finding that Massman has made "no clear and specific showing of loss" here, at least with respect to the difference in rental rates paid and what was anticipated with respect to the use of owned heavy equipment.

In fairness, however, it seems uncontrovertible that the movement to and from the Tennessee River site involved considerable heavy equipment owned by Massman. Actual expenses incurred in holding over personnel and equipment for the ten months delay period may have involved considerable loss or damage to Massman, apart from claimed allocation of office administrative or overhead expense generally.[16] We will remand the case, therefore, to the district court for resubmission to the hearing officer for another limited damages determination. The hearing officer should specifically consider Massman's possible damages with respect to moving, transfer and transportation costs and lay-up costs for the ten month delay period incurred by Massman. Such allowable damages, if any are proved, would be in addition to the damages award already made by the hearing officer. We afford this opportunity in the interest of justice since we affirm otherwise the decision with regard to major equipment expenses.

**B. Other Costs Specifically Identified by Massman**

 Massman has identified four other cost areas in which it was allegedly deprived of damages by Dean Penegar. These are the following:

16. On these costs, see *infra* at 1125–1126.

**1) Denied Profit of $148,304:**

Massman claims that it was due $148,304 profit as an "equitable adjustment" under the contract.

In a suit for breach of contract plaintiffs are not ordinarily entitled to *profit* on the amount of their damages. *See Torres v. United States*, 126 Ct.Cl. 76, 79, 112 F.Supp. 363, 365 (1953). A possible exception is the situation where a contract contained a "suspension-of-work" or otherwise specifically-designed "constructive change" clause. *See, e.g., Bennett v. United States*, 371 F.2d 859, 178 Ct.Cl. 61 (1967). Dean Penegar, however, found no such exceptional clause in the contract. Thus he held that delay was a mere *breach of* rather than an *"equitable adjustment" under the contract* and no profit could be recovered.

Massman responds that a "Changes" clause in the contract actually does allow an equitable adjustment for profit. This Changes clause reads as follows:

> *Changes.* The Contracting Officer may at any time, by written order, and without notice to the sureties, make changes in the work within the general scope of the contract, including changes in the drawings and specifications. If such changes cause an increase or decrease in the amount of work under this contract *or in the time necessary for its performance,* an equitable adjustment will be made in the price or the time allowed for performance, or both, and the contract shall be modified in writing accordingly. All claims by the Contractor for adjustment under this paragraph must be asserted within 30 days from the date the change is ordered, and in the meantime, the Contractor shall proceed with the work as so changed. [Emphasis added.]

 Massman's argument about this "Changes" language, however, is principally refuted by *United States v. Rice*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), wherein a Changes contract clause strik-

ingly similar to the instant one was in dispute. The court ruled that the Changes clause did not encompass equitable money adjustments for mere delay. The virtually identical contract language in *Rice* about "time" for completion of project simply protected the contractor from *losing the contract* if work was delayed by the government and the contractor thus could not complete the project within the time specified. *Id.* at 66–68, 63 S.Ct. at 123–24.

We affirm, therefore, the denial of an "equitable adjustment" profit item under the circumstances.

**(2) Denied home office expenses of $83,-946 including $20,453 during suspension of work.**

Dean Penegar again rejected Massman's damage claims here as inadequately substantiated. He emphasized that Massman's proof was devoid of the required demonstration that home office work could not have been transferred to other projects during the ten-month delay. *See, e.g., W.G. Cornell Co. v. Ceramic Coating,* 626 F.2d 990, 993 (D.C.Cir.1980). For the most part, Massman has not persuasively disputed this conclusion.

The testimony of Massman's president is quite instructive here. Massman essentially derived its home office expenses claim by indicating that these costs represented six (6%) percent of total work cost. Massman's own legal counsel began his questioning of Massman by saying:

> Q. Now, Mr. Massman, I want to direct your attention back to Exhibit 79, Item Number 13, and point out to you that represents home office expenses and indicates a six percent. *There is no back-up data within Exhibit 79 for that, is there, Mr. Massman?*

(Emphasis added). Massman answers "No, Sir," although he goes on to insist that this 6% figure was derived from "audits" by such entities as the Corps of Engineers and Ernst & Whinney. Dean Penegar finally broke in to question the support for this figure. He succeeded in getting the president to make this admission:

> THE HEARING OFFICER: Pardon the expression, but is this [the overhead expense calculation] for your pain and suffering?
>
> THE WITNESS: The pain and suffering is down under the interest. But, this is part of the pain and suffering, yes, sir.
>
> THE HEARING OFFICER: Dealing with these claims?
>
> THE WITNESS: Now, maybe it's not—maybe I misunderstood pain and suffering.

Massman's counsel then broke in and vainly attempted to shore up Massman's position.

Massman claims that the hearing officer's decision effectively rescinded the TVA purchasing agent's original award of $20,453 for established home office expenses during the later three-month suspension. Dean Penegar acknowledged that home overhead expenses represented a more plausible cost during the three-month suspension. It would also seem that the representative of the TVA contracting officer found some reasonable basis for computing the $20,453 amount. Equitably, then, Massman should be allowed to present very specific evidence on this limited issue upon remand and resubmission to the hearing officer.

**(3) Denied Interest of $553,524:**

Interest on claims against the United States cannot be recovered in the absence of an express provision to the contrary in the relevant statute or contract. 28 U.S.C. § 2516(a); *United States v. Alcea Bank of Tillamooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951). Massman nevertheless cites *L.L. Hall Constr. Co. v. United States,* 177 Ct.Cl. 870, 379 F.2d 559 (1966), as standing for the principle that an interest judgment is available because TVA was performing the contract in a proprietary rather than sovereign capacity. The *Hall* opinion, however, does not even address the issues of prejudgment interest or the proprietary status of government contracting. We also note that the Supreme Court has questioned in similar contexts the significance of any distinction between

the federal government's "proprietary" versus "sovereign" functions. *See, e.g., Federal Land Bank v. Board of County Comm'rs*, 368 U.S. 146, 150–51, 82 S.Ct. 282, 285–86, 7 L.Ed.2d 199 (1961). A number of circuits have also refused to award prejudgment interest for delay and/or extra cost in private construction cases because damages are usually not liquidated or otherwise readily ascertainable. *See, e.g., E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1042 (5th Cir.), *reh'g denied in part, granted in part on unrelated issue*, 559 F.2d 268 (5th Cir. 1977), *cert. denied, sub nom. Providence Hospital v. Manhattan Constr. Co.*, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978). We have been presented no persuasive argument for distinguishing these cases and awarding prejudgment interest; accordingly, it is denied.

### (4) Supervisory Wages

Dean Penegar accepted Massman's increased cost charge for wages of field employees ($9,303), but he found that the much larger claim of $54,794 for *home office payroll* was lacking in evidentiary support. Massman here also specifically complains that Dean Penegar's decision was so sweeping as to take back $12,208 granted by the purchasing agent for supervisory wages during the three-month delay. We find the record unclear as to this specific charge and the basis of disallowance. We would remand for specific reconsideration and treatment of this claim that the hearing officer's decision swept too broadly and improperly reduced the award here for the three-month suspension by $12,208.00.

### III. Whether Material Issues of Fact Still Existed Concerning the Fairness of the Administrative Process that TVA Provided to Massman.

█ Massman argued to the district court that the general structure of TVA's administrative claims process violated basic principles of procedural fairness. On appeal Massman again argues that "TVA must be barred ... from setting its own guidelines and standards on how disputes with TVA will be judged from its own selected and controlled forum."

Massman cites no case law bolstering this comprehensive procedural due process argument against TVA's administrative process. The District of Columbia circuit, citing a wealth of case law, rejected a substantively similar claim in *Jonal Corp. v. District of Columbia*, 533 F.2d 1192 (D.C. Cir.), *cert. denied*, 429 U.S. 825, 97 S.Ct. 80, 50 L.Ed.2d 88 (1976). The complaint there was that the District of Columbia Corporation Counsel was able to choose the administrative board *and* the attorney defending the municipal corporation against claims of contractors. The court held that this structure "does not, *per se*, constitute a violation of the due process clause of the Fifth Amendment." *Id.* at 1197. Following *Jonal*, we hold that the district court was correct to reject Massman's complaint against the general administrative structure of the contract's dispute procedure as lacking procedural fairness.

Thus Massman is relegated to the claim of actual bias rising to the level of a due process deprivation in this particular case by virtue of the *ex parte* administrative communication. The problem here is that Massman simply does not respond in a convincing fashion to the district court's specific holding that the *ex parte* communications were not prejudicial and thus not legally significant enough to bring about a due process violation.

The uncontroverted testimony in the record indicates that TVA contacted Dean Penegar simply for discovering when his long-awaited damages decision was to be issued. Massman's brief goes so far as to argue that "the depositions of key TVA employees make it *abundantly clear* that 'the merits' of the case were discussed [in the *ex parte* communications]...." Massman provides no discussion or analyses of these depositions. Instead, it makes only one fleeting reference to one deposition. The testimony there of the TVA Associate General Counsel involved, however, emphasizes that the merits of the case were not discussed. He stated that TVA inquired

only about when Dean Penegar was planning to issue a final decision.

We note, as did the District of Columbia circuit in *PATCO v. Federal Labor Relations Authority*, 685 F.2d 547 (D.C.Cir. 1982), that a procedural or "status report" inquiry by a party is not an *"ex parte communication"* as defined by the Government In The Sunshine Act, Pub.L. No. 94–409, 90 Stat. 1241 (1976). The Act defines *ex parte* communication as

> an oral or written communication not on the public record to which reasonable prior notice to all parties is not given, but ... *not includ[ing] requests for status reports on any matter or proceeding.*

(emphasis added); 685 F.2d at 563, citing 5 U.S.C. § 551(14). Thus a mere request for a status report from Dean Penegar does not rise to the level prohibited by this statutory definition of *ex parte* communication.

On the other hand, however, the D.C. circuit cited from a passage of the legislative history of the Act, which notes that

> A request for a status report or a background discussion may in effect amount to an indirect or subtle effort to influence the substantive outcome of the proceedings. The judgment will have to be made whether a particular communication could affect the agency's decision on the merits. In doubtful cases the agency official should treat the communication as ex parte so as to protect the integrity of the decision making process. S.Rep. No. 354, *supra*, at 37, Sunshine Act Sourcebook at 232. *Accord*, H.R.Rep. No. 880, Pt.I, *supra*, at 20–21, Sunshine Act Sourcebook at 531–32.

685 F.2d at 563.

■ This passage from the legislative history of the Sunshine Act makes clear that even one-sided "status report" inquiries are to be discouraged. On analysis of this record, however, we agree with the district court that there is no support for the view that TVA's actions, although unwise and without notice to the adversary party, could rise to the level of a due process violation. TVA's communication with Dean Penegar did not deprive Mass-man of a fair hearing under the circumstances of this record.

## CONCLUSION

In most respects we affirm the actions of the hearing officer and those of the district court with regard to this longstanding controversy. In respect of the limited remand as to certain damage claims, we hope that the parties will seek to settle and resolve these remaining relatively minor disputes in light of the length of time already elapsed in the administrative stages of the controversy and also in view of the time involved in the judicial disposition of the issues.

In summary, then, we AFFIRM the district court in its holding that the Contract Disputes Act of 1978 does not apply and that Massman is not entitled to a *de novo* hearing. We also AFFIRM the district court's ruling that Massman received essentially a fair administrative hearing untainted by TVA's *ex parte* communication with the hearing officer. We find no clear error in the decision that TVA was responsible for the ten-month delay at the outset and for the later three month delay; but that Massman generally failed to prove its major claims for damages, particularly with respect to the extra major equipment costs and rentals. We REMAND, in the interest of justice, only (1) to permit an assessment of the moving transportation, and lay-up costs entailed by Massman in being required to transfer major equipment to the job site for an anticipated 1975 beginning and then sending this equipment on to other jobs in 1975 to mitigate damages for the delay, (2) to permit a determination of Massman's actual costs and expenses entailed in keeping and maintaining necessary personnel and other equipment, if any, at the TVA job site for the ten months period from October 1975 to August 1976 before the actual beginning of the job, and (3) to permit Massman's presentation of specific evidence establishing that the hearing officer's holding against home supervisory wages and overhead expenses claims swept too broadly with respect to the purchasing

agent's original award of $20,453 for overhead expense and $12,208 for home supervisory wages during the three-month suspension.

Each party will bear its own costs.

CONTIE, Circuit Judge, concurring.

I agree with Judge Milburn that Massman failed to affirmatively elect to proceed under the Act as required by the statute and regulations. "These regulations were published in the Federal Register and the Code of Federal Regulations, have the force and effect of law, and all persons affected thereby are charged with legal notice of their provisions." *Adamsville Lumber Company, Inc. v. Rainey,* 348 F.Supp. 373, 376 (W.D.Tenn.1972) (Wellford, J.).

Accordingly, I concur in the judgment of the court and Parts II and III of the opinion.